[No. S127904. Apr. 26, 2007.]

BALBOA ISLAND VILLAGE INN, INC., Plaintiff and Respondent, v. ANNE LEMEN, Defendant and Appellant.

**COUNSEL**

D. Michael Bush; Erwin Chemerinsky; Sheppard Mullin Richter & Hampton, Gary L. Bostwick and Jean-Paul Jassy for Defendant and Appellant.

Dubia, Erickson, Tenerelli & Russo, Law Offices of J. Scott Russo and J. Scott Russo for Plaintiff and Respondent.

**OPINION**

**MORENO, J.**—Following a court trial in which defendant Anne Lemen was found to have repeatedly defamed plaintiff Balboa Island Village Inn, Inc., the superior court issued a permanent injunction prohibiting defendant from, among other things, repeating certain defamatory statements about plaintiff. For the reasons that follow, we hold that the injunction is overly broad, but that defendant's right to free speech would not be infringed by a properly limited injunction prohibiting defendant from repeating statements about plaintiff that were determined at trial to be defamatory.

FACTS

Aric Toll owns and manages the Balboa Island Village Inn (hereafter Village Inn or Inn), a restaurant and bar located on Balboa Island in Newport Beach. He bought it on November 30, 2000, but the Village Inn has been operating at that location for more than half a century.

In 1989, defendant Anne Lemen purchased the "Island Cottage," which lies across an alley from the Village Inn. She lives there part of the time and rents the cottage as a vacation home part of the time. Lemen is a vocal critic of the Village Inn and has contacted the authorities numerous times to complain of

excessive noise and the behavior of inebriated customers leaving the bar. In an effort to document these abuses, Lemen videotaped the Inn approximately 50 times. According to Lemen, she made these videotapes while on her own property, although she acknowledged that, on one occasion, she parked her Volkswagen bus across from the Inn and videotaped from there.

The Village Inn introduced evidence that Lemen's actions were far more intrusive. For more than two years, Lemen parked across from the Inn at least one day each weekend and made videotapes for hours at a time. Customers often asked Lemen not to videotape them as they entered or left the building. Numerous times, she followed customers to or from their cars while videotaping them. She took many flash photographs through the windows of the Inn a couple of days each week for a year, upsetting the customers. She called customers "drunks" and "whores." She told customers entering the Inn, "I don't know why you would be going in there. The food is shitty." She approached potential customers outside the Inn more than 100 times, causing many to turn away. One time, she stopped her vehicle in front of the Village Inn and sounded her horn for five seconds.

Lemen had several encounters with employees of the Village Inn. She told bartender Ewa Cook that Cook "worked for Satan," was "Satan's wife," and was "going to have Satan's children." She asked musician Arturo Perez if he had a "green card" and asked whether he knew there were illegal aliens working at the Inn. Lemen referred to Theresa Toll, the owner's wife, as "Madam Whore" and said, in the presence of her tenant, Larry Wilson: "Everyone on the island knows you're a whore." Three times, Lemen took photographs of cook Felipe Anaya and other employees while they were changing clothes in the kitchen.

Lemen collected 100 signatures on a petition opposing the Village Inn. As she did so, she told neighbors that there was child pornography and prostitution going on in the Inn, and that the Village Inn was selling drugs and was selling alcohol to minors. She said that sex videos were being filmed inside the Village Inn, that it was involved with the Mafia, that it encouraged lesbian activity, and that the Inn stayed open until 6:00 a.m. When defendant began collecting signatures door to door and making these statements, the Village Inn's sales dropped more than 20 percent.

On October 16, 2001, the Village Inn filed a civil complaint that, as amended, alleged causes of action for nuisance, defamation, and interference with business and sought injunctive relief against defendant. Following a court trial, the superior court entered judgment for plaintiff on October 11, 2002, granting a permanent injunction. Paragraph 4 of the injunction states:

"[T]he court orders that Lemen, her agents, all persons acting on her behalf or purporting to act on her behalf and all other persons in active concert and participation with her, be and hereby are, permanently enjoined from engaging in or performing directly or indirectly, any of the following acts:

"A. Defendant is prohibited from initiating contact with individuals known to Defendant to be employees of Plaintiff. Any complaints Defendant has regarding Plaintiff or Plaintiff's business must be communicated to a member or members of Plaintiff's management, who will be identified by Plaintiff for Defendant and for which Plaintiff will provide Defendant a phone number by which Defendant can timely and easily communicate any problems related to Plaintiff's operation.

"B. Defendant is prohibited from making the following defamatory statements about Plaintiff to third persons: Plaintiff sells alcohol to minors; Plaintiff stays open until 6:00 a.m.; Plaintiff makes sex videos; Plaintiff is involved in child pornography; Plaintiff distributes illegal drugs; Plaintiff has Mafia connections; Plaintiff encourages lesbian activities; Plaintiff participates in prostitution and acts as a whorehouse; Plaintiff serves tainted food.

"C. Defendant is prohibited from filming (whether by video camera or still photography) within 25 feet of the premises of the Balboa Island Village Inn unless Defendant engages in such filming while on Defendant's own property. An exception to this prohibition occurs when Defendant is documenting the circumstances surrounding an immediate disturbance or damage to her property. An example of this exception might involve Defendant's attempt to gather evidence regarding the mechanism and identity of any person who breaks the window of Defendant's house."

The Court of Appeal upheld paragraph 4C of the judgment, which granted an injunction prohibiting defendant from filming within 25 feet of the Village Inn, but invalidated paragraphs 4A and 4B of the judgment enjoining defendant from initiating contact with employees of the Village Inn and repeating the identified defamatory statements about the Village Inn, ruling that those portions of the judgment violated defendant's right to free speech under the federal and California Constitutions. We granted review.

We agree with the result reached by the Court of Appeal, but disagree in part with its reasoning. Paragraph 4A, which prohibits defendant from initiating contact with employees of the Village Inn at any time or place, is impermissibly broad. Paragraph 4B, which prohibits defendant from repeating certain defamatory statements, also is overly broad, but a properly limited injunction prohibiting defendant from repeating to third persons statements about the Village Inn that were determined at trial to be defamatory would not violate defendant's right to free speech.

DISCUSSION

■    The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech . . . ." This fundamental right to free speech is "among the fundamental personal rights and liberties which are protected by the Fourteenth Amendment from invasion by state action." (*Lovell v. Griffin* (1938) 303 U.S. 444, 450 [82 L.Ed. 949, 58 S.Ct. 666]; see *Gitlow v. New York* (1925) 268 U.S. 652, 666 [69 L.Ed. 1138, 45 S.Ct. 625].) Numerous decisions have recognized our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." (*New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 270 [11 L.Ed.2d 686, 84 S.Ct. 710].)

■    But the right to free speech, "[a]lthough stated in broad terms, . . . is not absolute." (*Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 134 [87 Cal.Rptr.2d 132, 980 P.2d 846] (plur. opn. of George, C. J.).) "Liberty of speech . . . is . . . not an absolute right, and the State may punish its abuse." (*Near v. Minnesota* (1931) 283 U.S. 697, 708 [75 L.Ed. 1357, 51 S.Ct. 625].) "The First Amendment presupposes that the freedom to speak one's mind is not only an aspect of individual liberty—and thus a good unto itself—but also is essential to the common quest for truth and the vitality of society as a whole. Under our Constitution, 'there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries, but on the competition of other ideas.' [Citation.] Nevertheless, there are categories of communication and certain special utterances to which the majestic protection of the First Amendment does not extend because they 'are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.' [Citation.] [¶] Libelous speech has been held to constitute one such category, [citation] . . . ." (*Bose Corp. v. Consumers Union of U. S., Inc.* (1984) 466 U.S. 485, 503–504 [80 L.Ed.2d 502, 104 S.Ct. 1949]; see *Ashcroft v. Free Speech Coalition* (2002) 535 U.S. 234, 245–246 [152 L.Ed.2d 403, 122 S.Ct. 1389] ["The freedom of speech has its limits; it does not embrace certain categories of speech, including defamation . . . ."]; *R. A. V. v. St. Paul* (1992) 505 U.S. 377, 382–383 [120 L.Ed.2d 305, 112 S.Ct. 2538]; *Beauharnais v. Illinois* (1952) 343 U.S. 250, 255–257, 266 [96 L.Ed. 919, 72 S.Ct. 725] ["Libelous utterances not being within the area of constitutionally protected speech . . . ."]; *Chaplinsky v. New Hampshire* (1942) 315 U.S. 568, 571–572 [86 L.Ed. 1031, 62 S.Ct. 766].)[1]

---

[1] The limitations upon actions for defamation brought by public figures do not apply here. (*Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 344–346 [41 L.Ed.2d 789, 94 S.Ct. 2997].)

Defendant in the present case objects to the imposition of an injunction prohibiting her from repeating statements the trial court determined were slanderous, asserting the injunction constitutes an impermissible prior restraint. We disagree. As explained below, an injunction issued following a trial that determined that the defendant defamed the plaintiff that does no more than prohibit the defendant from repeating the defamation, is not a prior restraint and does not offend the First Amendment.

The prohibition against prior restraints on freedom of expression is rooted in the English common law, but originally applied only to freedom of the press. In 1769, Blackstone explained in his Commentaries on the Laws of England that when printing first was invented in 1476, the press was entirely controlled by the government,[2] at first through the granting of licenses and later by the decrees of the Star Chamber: "The art of printing, soon after its introduction, was looked upon (as well in England as in other countries) as merely a matter of state, and subject to the coercion of the crown. It was therefore regulated with us by the king's proclamations, prohibitions, charters of privilege and of licence, and finally by the decrees of the court of star-chamber; which limited the number of printers, and of presses which each should employ, and prohibited new publications unless previously approved by proper licensers." (4 Blackstone's Commentaries 152, fn. a.) Blackstone observed that subjecting "the press to the restrictive power of a licenser" restricted freedom of expression. (*Id.* at p. 152.) It was only in 1694, Blackstone explained, after the end of the Star Chamber, that "the press became properly free . . . and has ever since so continued." (*Id.* at p. 152, fn. a.)

But the freedom granted to the press to print what it pleased without first having to obtain permission did not mean that government could not punish the press if it abused that privilege. Blackstone observed that in imposing criminal penalties for libel, "the *liberty of the press*, properly understood, is by no means infringed or violated. The liberty of the press is indeed essential to the nature of a free state: but this consists in laying no *previous* restraints upon publications, and not in freedom from censure for criminal matter when published. Every freeman has an undoubted right to lay what sentiments he pleases before the public: to forbid this, is to destroy the freedom of the press: but if he publishes what is improper, mischievous, or illegal, he must take the consequence of his own temerity." (4 Blackstone's Commentaries 151–152.)

---

[2] Meyerson, *The Neglected History of the Prior Restraint Doctrine: Rediscovering the Link Between the First Amendment and the Separation of Powers* (2001) 34 Ind. L.Rev. 295, 298–305 (providing a history of prior restraints on the press in England).

It was this former practice of the English government of licensing the press that inspired the First Amendment's prohibition against prior restraints: "When the first amendment was approved by the First Congress, it was undoubtedly intended to prevent government's imposition of any system of prior restraints similar to the English licensing system under which nothing could be printed without the approval of the state or church authorities." (Tribe, American Constitutional Law (2d ed. 1988) § 12-34, p. 1039.) As another noted commentator has explained: "The First Amendment undoubtedly was a reaction against the suppression of speech and of the press that existed in English society. Until 1694, there was an elaborate system of licensing in England, and no publication was allowed without a government granted license. . . . It is widely accepted that the First Amendment was meant, at the very least, to abolish such prior restraints on publication." (Chemerinsky, Constitutional Law: Principles and Policies (2d ed. 2002) § 11.1.1, p. 892, fn. omitted.)

This prohibition against prior restraints of the press led to the rule that the publication of a writing could not be prevented on the grounds that it allegedly would be libelous. In 1839, the New York Court of Chancery refused to prevent the publication of a pamphlet that allegedly would have defamed the plaintiff, holding that the publication of a libel could not be enjoined "without infringing upon the liberty of the press, and attempting to exercise a power of *preventative* justice which . . . cannot safely be entrusted to any tribunal consistently with the principles of a free government." (*Brandreth v. Lance* (1839) 8 Paige 24, 26, italics added.) The court noted that the "Court of star chamber in England[3] . . . was undoubtedly in the habit of restraining the publications of such libels by injunction. Since that court was abolished, however, I believe there is but one case upon record in which any court, either in this country or in England, has attempted, by an injunction or order of the court, to prohibit or restrain the publication of a libel, as such, in anticipation." (*Brandreth v. Lance, supra*, at pp. 26–27.) The court refused, therefore, to prevent the defendants from publishing the pamphlet, but left them with this warning: "And if the defendants persist in their intention of giving this libelous production to the public, [the plaintiff] must seek his remedy by a civil suit in a court of law or by instituting a criminal prosecution, to the end that the libelers, upon conviction, may receive their appropriate punishment, in the penitentiary or otherwise." (*Id.* at pp. 28–29.)

But preventing a person from speaking or publishing something that, allegedly, would constitute a libel if spoken or published is far different from

---

[3] Which, the court noted in colorful language, "once exercised the power of cutting off the ears, branding the foreheads, and slitting the noses of the libelers of important personages." (*Brandreth v. Lance, supra*, 8 Paige 24, 26.)

issuing a posttrial injunction *after* a statement that already has been uttered has been found to constitute defamation. Prohibiting a person from making a statement or publishing a writing *before* that statement is spoken or the writing is published is far different from prohibiting a defendant from *repeating* a statement or *republishing* a writing that has been determined at trial to be defamatory and, thus, unlawful. This distinction is hardly novel.

In 1878, the English Court of Common Pleas upheld a posttrial injunction prohibiting the repetition of a libel. The plaintiffs in *Saxby v. Easterbrook* (1878) 3 C.P.D. 339 were a firm of engineers that had applied for a patent for a railway device. The defendants printed a statement claiming they had invented the device and the plaintiffs had stolen it from them. The plaintiffs sued and were awarded damages and an injunction restraining the defendants from "repetitions of acts of the like nature." (*Id.* at p. 341.) The English Court of Common Pleas affirmed the judgment. Lord Coleridge wrote: "I can well understand a court of Equity declining to interfere to restrain the publication of that which has not been found by a jury to be libelous. Here, however, the jury have found the matter complained of to be libelous . . . ." (*Id.* at p. 342.) Judge Lindley agreed, stating that "when a jury have *found* the matter complained of to be libelous . . . , I see no principle by which the court ought to be precluded from saying that the repetition of the libel shall be restrained." (*Id.* at p. 343.)

An early case in Missouri reached the same conclusion, stating: "After verdict in favor of the plaintiffs, they can have an injunction to restrain any further publication of that which the jury has found to be an actionable libel or slander." (*Flint v. The Hutchinson Smoke Burner Co.* (1892) 110 Mo. 492 [19 S.W. 804, 806].) And in 1916, Roscoe Pound noted in an article in the Harvard Law Review that English courts would allow "an injunction in case the libel was repeated or publication was continued after a jury had found the matter libelous." (Pound, *Equitable Relief Against Defamation and Injuries to Personality* (1916) 29 Harv. L.Rev. 640, 665, fn. omitted.)

The Court of Appeal in the present case based its contrary conclusion that the injunction was an invalid prior restraint of speech on language in *Near v. Minnesota, supra,* 283 U.S. 697. Only when taken out of context, however, does the language in *Near* support the Court of Appeal's conclusion.

In *Near v. Minnesota, supra,* 283 U.S. 697, 702, the high court considered a statute that permitted a court to enjoin as a nuisance the publication of a " 'malicious, scandalous and defamatory newspaper' " or other periodical. The district court had found that several editions of a newspaper, The Saturday Press, "were 'chiefly devoted to malicious, scandalous and defamatory articles' " concerning the Mayor and the Chief of Police of Minneapolis, as

well as the county attorney and other officials. (*Id.* at p. 706.) The court " 'abated' " The Saturday Press as a public nuisance and the defendant was "perpetually enjoined" from publishing " 'any publication whatsoever which is a malicious, scandalous or defamatory newspaper.' " (*Ibid.*)

The high court in *Near* recognized that prohibiting the future publication of a newspaper or other periodical "is of the essence of censorship." (*Near v. Minnesota, supra*, 283 U.S. 697, 713.) The court stated that the "chief purpose" of the guarantee of liberty of the press is "to prevent previous restraints upon publication." (*Id.* at p. 713.) The high court was careful to point out, however, that the statute being considered was "not aimed at the redress of individual or private wrongs. Remedies for libel remain available and unaffected." (*Id.* at p. 709.) The court also observed that "the common law rules that subject the libeler to responsibility . . . are not abolished by the protection extended in our constitutions." (*Id.* at p. 715.) But most significant is that the court, after noting that "the protection even as to previous restraint is not absolutely unlimited," clarified that it was not addressing "questions as to the extent of authority to prevent publications in order to protect private rights according to the principles governing the exercise of the jurisdiction of courts of equity." (*Id.* at p. 716, fn. omitted.) In a footnote, the court cited the above quoted article by Roscoe Pound that observed that English courts permit "an injunction in case the libel was repeated or publication was continued after a jury had found the matter libelous." (Pound, *Equitable Relief Against Defamation and Injuries to Personality, supra*, 29 Harv. L.Rev. at p. 665.) Therefore, *Near* expressly did not address the issue posed in the present case.[4]

The United States Supreme Court has never addressed the precise question before us—whether an injunction prohibiting the repetition of statements found at trial to be defamatory violates the First Amendment. But several high court decisions have addressed related questions, and each is consistent with our holding that a court may enjoin the repetition of a statement that was determined at trial to be defamatory.

The decision in *Kingsley Books, Inc. v. Brown* (1957) 354 U.S. 436, 437 [1 L.Ed.2d 1469, 77 S.Ct. 1325], upheld a state law authorizing a " 'limited

---

[4] A law review article from half a century ago recognized that the injunction in *Near* "was directed against the total silencing of the newspaper. An entirely different problem is presented when, for example, a plaintiff asks merely that a defendant be enjoined from distributing particular defamatory statements already in print. An injunction of the latter type would be no more objectionable as a restriction of free speech than punishment of defamation by punitive damage awards and criminal libel prosecutions. In neither case is the inhibition one upon speech in general, but only upon a specific group of words which have been adjudged to be beyond the range of constitutional protection." (Note, *Developments in the Law of Defamation* (1956) 69 Harv. L.Rev. 874, 944, fns. omitted.)

injunctive remedy' " prohibiting "the sale and distribution of written and printed matter found after due trial to be obscene." The high court rejected the defendant's argument that issuance of an injunction "amounts to a prior censorship" in violation of the First Amendment (*Kingsley Books, Inc.*, at p. 440), quoting *Near v. Minnesota, supra*, 283 U.S. 697, 716, for the proposition that " 'the protection even as to previous restraint is not absolutely unlimited.' " (*Kingsley Books, supra*, 354 U.S. at p. 441.) The high court recognized that the term "prior restraint" cannot be applied unthinkingly: "The phrase 'prior restraint' is not a self-wielding sword. Nor can it serve as a talismanic test." (*Ibid.*) The court pointed out that the defendants in *Kingsley Books* "were enjoined from displaying for sale or distributing only the particular booklets theretofore published and adjudged to be obscene." (*Id.* at p. 444.) This fact distinguished *Kingsley Books* from the decision in *Near v. Minnesota, supra*, 283 U.S. 697, which had ruled that the abatement as a public nuisance of a newspaper was an invalid prior restraint, noting that the abatement in *Near* "enjoin[ed] the dissemination of future issues of a publication because its past issues had been found offensive," which is " 'the essence of censorship.' " (*Kingsley Books, supra*, 354 U.S. at p. 445.) The high court in *Kingsley Books* observed that the injunction was "glaringly different" from the prior restraint in *Near*, because it "studiously withholds restraint upon matters not already published and not yet found to be offensive." (354 U.S. at p. 445.)

*Paris Adult Theatre I v. Slaton* (1973) 413 U.S. 49, 55 [37 L.Ed.2d 446, 93 S.Ct. 2628] upheld a Georgia statute authorizing an injunction prohibiting the exhibition of obscene materials because the statute "imposed no restraint on the exhibition of the films involved in this case until after a full adversary proceeding and a final judicial determination by the Georgia Supreme Court that the materials were constitutionally unprotected."

*Pittsburgh Press Co. v. Human Rel. Comm'n* (1973) 413 U.S. 376 [37 L.Ed.2d 669, 93 S.Ct. 2553] held that an order forbidding a newspaper from publishing "help wanted" advertisements in gender-designated columns was not a prohibited prior restraint on expression. A city ordinance had been interpreted to forbid such segregation of advertisements as unlawful sexual discrimination in employment. The high court held that the First Amendment did not protect such illegal conduct, stating: "We have no doubt that a newspaper constitutionally could be forbidden to publish a want ad proposing a sale of narcotics or soliciting prostitutes." (413 U.S. at p. 388.) The court held that the order was not a prohibited prior restraint on expression, noting that it never had held that all injunctions against newspapers were impermissible: "The special vice of a prior restraint is that communication will be suppressed . . . before an adequate determination that it is unprotected by the First Amendment. [¶] The present order does not endanger arguably protected speech. Because the order is based on a continuing course of repetitive

conduct, this is not a case in which the Court is asked to speculate as to the effect of publication. [Citation.]" (413 U.S. at p. 390; see also *Madsen v. Women's Health Center, Inc.* (1994) 512 U.S. 753, 764, fn. 2 [129 L.Ed.2d 593, 114 S.Ct. 2516] ["Not all injunctions that may incidentally affect expression, however, are 'prior restraints' in the sense that the term was used in *New York Times Co.* [*v. United States* (1971) 403 U.S. 713 [29 L.Ed.2d 822, 91 S.Ct. 2140]] or *Vance* [*v. Universal Amusement Co.* (1980) 445 U.S. 308 [63 L.Ed.2d 413, 100 S.Ct. 1156]]"].)

In each of these cases, the high court held an injunctive order prohibiting the repetition of expression that had been judicially determined to be unlawful did not constitute a prohibited prior restraint of speech. (See *Kramer v. Thompson* (3d Cir. 1991) 947 F.2d 666, 675 ["The United States Supreme Court has held repeatedly that an injunction against speech generally will not be considered an unconstitutional prior restraint if it is issued after a jury has determined that the speech is not constitutionally protected."]; see *DVD Copy Control Assn., Inc. v. Bunner* (2003) 31 Cal.4th 864, 891–892 [4 Cal.Rptr.3d 69, 75 P.3d 1] (conc. opn. of Moreno, J.) ["a preliminary injunction poses a danger that permanent injunctive relief does not: that potentially protected speech will be enjoined prior to an adjudication on the merits of the speaker's or publisher's First Amendment claims"].)

Decisions of two federal courts echo this conclusion. *Auburn Police Union v. Carpenter* (1st Cir. 1993) 8 F.3d 886, upheld an injunction under a Maine statute that prohibited solicitations for the benefit of a law enforcement officer, agency, or association, rejecting the argument that an injunction against such solicitation necessarily would constitute an invalid prior restraint on expression: "The Supreme Court . . . 'has never held that all injunctions are impermissible.' [Citation.] 'The special vice of a prior restraint is that communication will be suppressed, either directly or by inducing excessive caution in the speaker, before an adequate determination that it is unprotected by the First Amendment.' [Citation.] An injunction that is narrowly tailored, based upon a continuing course of repetitive speech, and granted only after a final adjudication on the merits that the speech is unprotected does not constitute an unlawful prior restraint." (*Id.* at p. 903; see *Haseotes v. Cumberland Farms, Inc.* (Bankr. D.Mass. 1997) 216 B.R. 690, 695.)

In *Lothschuetz v. Carpenter* (6th Cir. 1990) 898 F.2d 1200, the district court awarded nominal damages after finding that the defendant had repeatedly libeled the plaintiffs but denied the plaintiffs' request for an injunction, ruling that it would constitute "an unwarranted prior restraint on freedom of speech." (*Id.* at p. 1206.) The court of appeals reversed, stating that "in view of [the defendant]'s frequent and continuing defamatory statements, an injunction is necessary to prevent future injury to [the plaintiff]'s personal

reputation and business relations. [Citations.]" (*Id.* at pp. 1208–1209 (conc. & dis. opn. of Wellford, J.).)[5] The court of appeals majority made clear that it "would limit the application of such injunction to the statements which have been found in this and prior proceedings to be false and libelous." (*Ibid.*)

The highest courts of several of our sister states have reached the same conclusion. The Ohio Supreme Court upheld a complaint that sought injunctive relief to prohibit the defendant from repeating statements after those statements were proven at trial to be defamatory. The court held: "Once speech has judicially been found libelous, if all the requirements for injunctive relief are met, an injunction for restraint of continued publication of that *same* speech may be proper. The judicial determination that specific speech is defamatory must be made prior to any restraint. [Citation.]" (*O'Brien v. Tenants* (1975) 42 Ohio St. 2d 242, 245 [327 N.E.2d 753, 755].)

The Georgia Supreme Court upheld an injunction issued following a jury trial in a libel case that prohibited the repetition of the statements found to be defamatory. The plaintiff in *Retail Credit v. Russell* (1975) 234 Ga. 765 [218 S.E.2d 54] discovered that the defendant credit reporting company had published a report erroneously stating the plaintiff had been fired from a previous job for stealing from his former employer. The plaintiff provided to the defendant a letter from his former employer completely refuting this libel. The jury found that the defendant promised to retract the statement, but failed to do so and, in fact, distributed further reports that repeated the libel. The jury awarded $15,000 in damages to the plaintiff, and the trial court "entered a narrowly-drawn order enjoining Retail Credit from the further publication of the adjudicated libel." (*Id.*, 218 S.E.2d at p. 56.) The Georgia Supreme Court rejected Retail Credit's claim that the injunction constituted an unconstitutional prior restraint on expression, stating: "The jury verdict necessarily found the statements of Retail Credit to have been false and defamatory, and the evidence authorized a conclusion that the libel had been repetitive. . . . Thus, prior to the issuance of the injunction 'an adequate determination [was made] that it is unprotected by the First Amendment'; the 'order is based on a continuing course of repetitive conduct'; and 'the order is clear and sweeps no more broadly than necessary.' [Citation.] The protections recognized in *Pittsburgh Press* have been accorded Retail Credit and this injunction is not subject to the complaints made of it." (*Id.* at pp. 62–63, italics added.) The court added: " 'The present order does not endanger arguably protected speech. Because the order is based on a continuing course of repetitive conduct, this is not a case in which the court is asked to speculate as to the effect of publication.' " (*Id.* at p. 62.)

---

[5] Judge Wellford's concurring and dissenting opinion was joined by Judge Hull and, thus, is "the opinion of the court on this issue." (*Lothschuetz v. Carpenter, supra,* 898 F.2d 1200, 1206.)

The Supreme Court of Minnesota upheld an injunction issued following a jury trial that prohibited further publication of a book and a document that had been determined at trial to contain defamatory statements. "[C]ourts have . . . upheld the suppression of libel, so long as the suppression is limited to the precise statements found libelous *after* a full and fair adversary proceeding. [Citations.] We therefore hold that the injunction below, limited as it is to material found either libelous or disparaging after a full jury trial, is not unconstitutional and may stand." (*Advanced Training Sys. v. Caswell Equip. Co.* (Minn. 1984) 352 N.W.2d 1, 11.)

In *Sid Dillon Chevrolet v. Sullivan* (1997) 251 Neb. 722 [559 N.W.2d 740], the Nebraska Supreme Court overturned an injunction issued *prior* to trial that prohibited speech, quoting the "general rule" that "equity will not enjoin a libel or slander." (*Id.*, 559 N.W.2d at p. 746.) Among the reasons for this general rule is that "the defendant would be deprived of the right to a jury trial concerning the truth of his or her allegedly defamatory publication . . . ." (*Ibid.*) The court recognized, however, that this general rule does not necessarily apply to an injunction prohibiting speech that is issued following a trial at which the statements have been found to be unlawful: "Some jurisdictions have concluded that an order enjoining further publication of libelous or slanderous material does not constitute a prior restraint on speech where there has been a full and fair adversarial proceeding in which the complained of publications were found to be false or misleading representations of fact prior to the issuance of injunctive relief. [Citations.]" (*Ibid.*) Accordingly, the court carefully limited its holding to injunctions issued prior to trial: "We adopt the view of those jurisdictions that have considered the issue and hold that *absent a prior adversarial determination that the complained of publication is false or a misleading representation of fact*, equity will not issue to enjoin a libel or slander . . . ." (*Id.* at p. 747, italics added; see *Nolan v. Campbell* (2004) 13 Neb.App. 212, 226 [690 N.W.2d 638, 652] ["Here, the restraint via the injunction is permissible because the speech had been adjudicated to be libelous and therefore not to be protected under the First Amendment. Therefore, the trial court did not err in issuing an injunction."]; see also Annot., Injunction as Remedy Against Defamation of Person (1956) 47 A.L.R.2d 715, 728 ["It may be argued that the constitutionally guaranteed rights of free speech and trial by jury are not infringed by equitable interference with the right of publication where the defamatory nature of the publications complained of has once been established by a trial at law, and the plaintiff seeks to restrain further similar statements."]; 42 Am.Jur.2d (2000) Injunctions, § 96, p. 691 ["Once speech has judicially been found libelous, if all the requirements for injunctive relief are met, an injunction for restraint of continued publication of that same speech may be proper."].)

Accordingly, we hold that, following a trial at which it is determined that the defendant defamed the plaintiff, the court may issue an injunction

prohibiting the defendant from repeating the statements determined to be defamatory. (*Aguilar v. Avis Rent A Car System, Inc.*, *supra*, 21 Cal.4th 121, 140 (plur. opn. of George, C. J.) ["[O]nce a court has found that a specific pattern of speech is unlawful, an injunctive order prohibiting the repetition, perpetuation, or continuation of that practice is not a prohibited 'prior restraint' of speech. [Citation.]"].) Such an injunction, issued only following a determination at trial that the enjoined statements are defamatory, does not constitute a prohibited prior restraint of expression.　█　"Once specific expressional acts are properly determined to be unprotected by the first amendment, there can be no objection to their subsequent suppression or prosecution." (Tribe, American Constitutional Law, *supra*, § 12-37, pp. 1054–1055; see Redish, *The Proper Role of the Prior Restraint Doctrine in First Amendment Theory* (1984) 70 Va. L.Rev. 53, 55 ["in certain instances prior restraints are appropriately disfavored . . . because of the coincidental harm to fully protected expression that results from the *preliminary* restraint imposed prior to a decision on the merits of a *final* restraint. . . . Such interim restraints present a threat to first amendment rights . . . that expression will be abridged . . . prior to a full and fair hearing before an independent judicial forum to determine the scope of the speaker's constitutional right."].)

Lemen argues that damages are the sole remedy available for defamation, stating: "The traditional rule of Anglo-American law is that equity has no jurisdiction to enjoin defamation."[6] But, as Lemen acknowledges, this general rule "was established in eighteenth-century England." At that time, the courts of law and the courts of equity were separate.[7] This long-since-abandoned separation of the courts of law and equity accounts for the general rule that equity will not enjoin defamation. As one commentator has explained: "By the end of the Fifteenth Century, complaints against defamation were heard in two different courts, the Star Chamber and the common-law courts. . . . [¶] . . . [¶] When the Star Chamber was abolished in 1641, the common-law courts assumed its former jurisdiction over defamation . . . . [¶] . . . [¶] The courts of equity, accordingly, were denied authority to hear claims for defamation. As early as 1742, it was ruled in the *St. James's Evening Post*

---

[6] The general rule upon which Lemen relies is not universally accepted. As one commentator has observed: "Upon the question of relief by injunction against the publication of defamatory statements affecting the character or business of persons, the authorities both in England and America present a noticeable want of uniformity, and are indeed wholly irreconcilable." (Newell, Libel and Slander (2d ed. 1898) p. 246a.)

[7] "English equity as a system administered by a tribunal apart from the established courts made its first appearance in the reign of Edward I . . . ." (30A C.J.S. (1992) Equity, § 3, p. 162.) "For centuries law and equity were administered in England by two separate and distinct sets of courts, each applying exclusively its own system of jurisprudence, and following its own system of procedure, but, by statute and constitutional provision, this dual system of administration was abolished and provision was made for the administration of equity in a consolidated court." (*Id.*, § 4, p. 163.) Separate courts of equity were abolished in England in 1873. (27A Am.Jur.2d (1996) Equity, § 3, p. 521.)

*Case*, that the courts of equity had no jurisdiction over claims of libel and slander: 'For whether it is a libel against the publick or private persons, the only method is to proceed at law.' Since the common-law courts then had no power at all to grant injunctions, the resultant ruling meant that, in England, defamation could not be enjoined; the only permissible remedy was money damages at law. . . . [¶] . . . [¶] Thus, an extraordinarily important rule was created more as an offshoot of a jurisdictional dispute than as a calculated understanding of the needs of a free press. In fact, the creation of the rule that equity will not enjoin a libel parallels the almost anti-climatic ending of licensing of the press. These were both 'historical accidents' . . . ." (Meyerson, *The Neglected History of the Prior Restraint Doctrine: Rediscovering the Link Between the First Amendment and Separation of Powers, supra*, 34 Ind. L.Rev. 295, 309–311, fns. omitted.)[8]

Further, as some of the authorities cited by Lemen acknowledge, the general rule that a defamation may not be enjoined does not apply in a circumstance such as that in the present case in which an injunction is issued to prevent a defendant from repeating statements that have been judicially determined to be defamatory. For example, after stating that "[a]s a general rule, an injunction will not lie to restrain a libel or slander" (43A C.J.S. (2004) Injunctions, § 255, p. 283), Corpus Juris Secundum clarifies that this general rule does not apply in circumstances like those in the present case: "After an action at law in which there is a verdict finding the statements published to be false, the plaintiff on a proper showing may have an injunction restraining any further publication of the matter which the jury has found to be acts of libel or slander . . . ." (*Id.* at § 255, p. 284.) To the same effect, the annotation written by W. E. Shipley and cited by Lemen states as a general rule "that equity will not grant an injunction against the publication of a personal libel or slander" (Annot., Injunction as Remedy Against Defamation of Person, *supra*, 47 A.L.R.2d at p. 716) but also acknowledges: "It may be argued that the constitutionally guaranteed rights of free speech and trial by jury are not infringed by equitable interference with the right of publication where the defamatory nature of the publications complained of has once been established by a trial at law, and the plaintiff seeks to restrain further similar statements." (*Id.* at p. 728.)[9]

---

[8] " 'Prior to the Common-Law Procedure Act 1854, no court could grant any injunction in a case of libel. The Court of Chancery could grant no injunction in such a case, because it could not try a libel. Neither could courts of common law until the Common-Law Procedure Act of 1854, because they had no power to grant injunctions.' " (*American Malting Co. v. Keitel* (2d Cir. 1913) 209 F. 351, 354.)

[9] Consistently, American Jurisprudence Second observes that "while it is true that equity will not normally restrain a libel, the rule is not without exception . . . and an injunction properly issued to prohibit a defendant from reiterating statements which had been found in current and prior proceedings to be false and libelous . . . ." (42 Am.Jur.2d, *supra*, Injunctions, § 98, p. 693.)

In determining whether an injunction restraining defamation may be issued, therefore, it is crucial to distinguish requests for preventive relief prior to trial and posttrial remedies to prevent repetition of statements judicially determined to be defamatory. As one commentator aptly recognized: "There are two stages at which it would be in the plaintiff's interest to enjoin publication of a defamation—firstly to preclude the initial public distribution, and secondly to bar continued distributions after a matter has been adjudged defamatory. [¶] The attempt to enjoin the initial distribution of a defamatory matter meets several barriers, the most impervious being the constitutional prohibitions against prior restraints on free speech and press. . . . [¶] In addition, such an injunction may be denied on the ground that equitable jurisdiction extends only to property rights and not personalty . . . . [¶] In a few states the requirement that criminal libels be tried by a jury has been applied to civil cases as well, thus providing a third objection to the granting of an injunction against the initial distribution of defamatory matter. [¶] *In contrast, an injunction against continued distribution of a publication which a jury has determined to be defamatory may be more readily granted.* The simplest procedure is to add a prayer for injunctive relief to the action for damages. . . . Since the constitutional problems of a prior restraint are not present in this situation, and the defendant has not been deprived of a jury determination, injunctions should be available as ancillary relief for . . . personal and political defamations." (1 Hanson, Libel and Related Torts (1969) § 170, pp. 139–140, italics added.)

Accepting Lemen's argument that the only remedy for defamation is an action for damages would mean that a defendant harmed by a continuing pattern of defamation would be required to bring a succession of lawsuits if an award of damages was insufficient to deter the defendant from continuing the tortious behavior. This could occur if the defendant either was so impecunious as to be "judgment proof," or so wealthy as to be willing to pay any resulting judgments. Thus, a judgment for money damages will not always give the plaintiff effective relief from a continuing pattern of defamation. The present case provides an apt example. The Village Inn did not seek money damages in its amended complaint. The Inn did not want money from Lemen; it just wanted her to stop.[10]

---

[10] Justice Kennard's concurring and dissenting opinion states that the majority holds that "future speech may be enjoined irrespective of whether monetary damages would have been an adequate remedy." (Conc. & dis. opn. of Kennard, J., *post*, at p. 1164.) We do not so hold. We hold that an injunction prohibiting the defendant from repeating a statement determined to be defamatory does not constitute a prohibited prior restraint of speech. We also hold that an award of damages is not the sole remedy available for defamation. We express no view on whether, in an individual case, an injunction prohibiting the defendant from repeating defamatory statements could, or should, be denied because an award of damages would be an adequate remedy.

■    We recognize, of course, that a court must tread lightly and carefully when issuing an order that prohibits speech. In *Carroll v. Princess Anne* (1968) 393 U.S. 175 [21 L.Ed.2d 325, 89 S.Ct. 347], the high court invalidated a restraining order prohibiting the continuation of a public rally conducted by a "white supremacist" organization that had been issued ex parte without notice to the enjoined parties.    ■    In explaining the importance of giving the enjoined parties an opportunity to be heard, the high court in *Princess Anne* stressed the importance of limiting any order restraining speech: "An order issued in the area of First Amendment rights must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order. In this sensitive field, the State may not employ 'means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.' [Citation.] In other words, the order must be tailored as precisely as possible to the exact needs of the case." (*Carroll v. Princess Anne, supra*, 393 U.S. at pp. 183–184; see *Pittsburgh Press Co. v. Human Rel. Comm'n, supra*, 413 U.S. 376, 390 [upholding an order that is "clear and sweeps no more broadly than necessary"]; *Aguilar v. Avis Rent A Car System, Inc., supra*, 21 Cal.4th 121, 140–141 (plur. opn. of George, C. J.).)

■    The court in *Madsen v. Women's Health Center, Inc., supra*, 512 U.S. at page 765, held that review of an injunction, as opposed to an ordinance, that restricted the time, place, and manner of protected expression "require[s] a somewhat more stringent application of general First Amendment principles." The high court explained: "In past cases evaluating injunctions restricting speech, [citations], we have relied upon such general principles while also seeking to ensure that the injunction was no broader than necessary to achieve its desired goals. [Citations.] Our close attention to the fit between the objectives of an injunction and the restrictions it imposes on speech is consistent with the general rule, quite apart from First Amendment considerations, 'that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.' [Citations.]" (*Ibid.*)

The same result obtains under the California Constitution. Article I, section 2, subdivision (a) of the California Constitution states: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right." In *Dailey v. Superior Court* (1896) 112 Cal. 94 [44 P. 458], this court overturned an order issued prior to a play's opening performance that prohibited the performance or advertising of the play because it was based upon the facts of a pending criminal trial. Concluding that the order constituted a prohibited prior restraint of expression, this court observed that the wording of the above quoted constitutional provision "is terse and vigorous, and its meaning so plain that construction is not needed. . . . It is patent that this right to speak, write, and publish, cannot

be abused until it is exercised, and before it is exercised there can be no responsibility." (*Id.* at p. 97.) In *Wilson v. Superior Court* (1975) 13 Cal.3d 652, 658 [119 Cal.Rptr. 468, 532 P.2d 116], we held that a preliminary injunction issued prior to trial that prohibited the distribution of a political campaign leaflet was unconstitutional because it "constituted a prior restraint on publication."

Despite the broad language in the California Constitution protecting speech, we have recognized that a court may enjoin further distribution of a publication that was found at trial to be unlawful, stating: "[I]f the trial court finds the subject matter obscene under prevailing law an injunctive order may be fashioned . . . . It is entirely permissible from a constitutional standpoint to enjoin further exhibition of specific magazines or films which have been finally adjudged to be obscene following a full adversary hearing. [Citations.]" (*People ex rel. Busch v. Projection Room Theater* (1976) 17 Cal.3d 42, 57 [130 Cal.Rptr. 328, 550 P.2d 600]; see *Aguilar v. Avis Rent A Car System, Inc., supra,* 21 Cal.4th 121, 144–145 (plur. opn. of George, C. J.) ["Under the California Constitution, as under its federal counterpart, the injunction in the present case thus does not constitute a prohibited prior restraint of speech, because defendants simply were enjoined from continuing a course of repetitive speech that had been judicially determined to constitute unlawful harassment in violation of the FEHA."].)

The injunction in the present case is broader than necessary to provide relief to plaintiff while minimizing the restriction of expression. (*Madsen v. Women's Health Center, Inc., supra,* 512 U.S. 753, 765.) The injunction applies not just to Lemen but to "her agents, all persons acting on her behalf or purporting to act on her behalf and all other persons in active concert and participation with her." There is no evidence in the record, however, to support a finding that anyone other than Lemen herself defamed plaintiff, or that it is likely that Lemen will induce others to do so in the future. Therefore, the injunction, to be valid, must be limited to prohibiting Lemen personally from repeating her defamatory statements.[11]

Further, the injunction must not prevent Lemen from presenting her grievances to government officials. The right to petition the government for redress of grievances is "among the most precious of the liberties safeguarded by the Bill of Rights." (*Mine Workers v. Illinois Bar Assn.* (1967) 389 U.S. 217, 222 [19 L.Ed.2d 426, 88 S.Ct. 353].) Accordingly, paragraph 4B, which prohibits Lemen "from making the following defamatory statements about Plaintiff to third persons" must be modified to prohibit Lemen "from making

---

[11] We express no view regarding whether the scope of the injunction properly could be broader if people other than Lemen purported to act on her behalf.

the following defamatory statements about Plaintiff to third persons other than governmental officials with relevant enforcement responsibilities."

The injunction prohibits Lemen from "initiating contact with individuals known to Defendant to be employees of Plaintiff." We agree with the Court of Appeal that this restriction "sweeps more broadly than necessary" because it "includes no time, place, and manner restrictions but prohibits Lemen from initiating any type of contact with a known Village Inn employee anywhere, at any time, regarding any subject."[12]

■ Lemen argues that she cannot be enjoined from repeating the same statements found to be defamatory, because a change in circumstances might render permissible a statement that was defamatory, stating: "A statement that was once false may become true later in time." If such a change in circumstances occurs, defendant may move the court to modify or dissolve the injunction. Civil Code section 3424, subdivision (a) states: "Upon notice and motion, the court may modify or dissolve a final injunction upon a showing that there has been a material change in the facts upon which the injunction was granted . . . ." "This statute codifies a long-settled judicial recognition of the inherent power of the court to amend an injunction in the interest of justice when '. . . there has been a change in the controlling facts upon which the injunction rested . . . .' [Citations.]" (*Swan Magnetics, Inc. v. Superior Court* (1997) 56 Cal.App.4th 1504, 1509 [66 Cal.Rptr.2d 541].) By the same token, the Village Inn could move to modify the injunction if Lemen repeated her defamatory statements in a manner not expressly covered by the injunction.[13]

■ If it chose to, the trial court could retain jurisdiction to monitor the enforcement of the injunction. "The jurisdiction of a court of equity to enforce its decrees is coextensive with its jurisdiction to determine the rights of the parties, and it has power to enforce its decrees as a necessary incident to its jurisdiction. Except where the decree is self-executing, jurisdiction of the cause continues for this purpose, or leave may be expressly reserved to reinstate the cause for the purpose of enforcing the decree, or to make such further orders as may be necessary. [Citations.]" (*Klinker v. Klinker* (1955) 132 Cal.App.2d 687, 694 [283 P.2d 83].)

---

[12] The Court of Appeal upheld the final paragraph of the injunction, which prohibits Lemen "from filming . . . within 25 feet of the premises" of the Village Inn, except on Lemen's own property. Lemen did not seek review of this portion of the Court of Appeal's decision and does not challenge it in this court.

[13] Justice Kennard's concurring and dissenting opinion states that the majority holds that "a defendant's truthful future speech may be subjected to judicial censorship." (Conc. & dis. opn. of Kennard, J., *post*, at p. 1164.) We do not so hold. We hold only that the possibility that a change in circumstances could alter the nature of a statement found to be defamatory does not prohibit a court from issuing an injunction prohibiting the defendant from repeating that statement.

Accordingly, we agree with the Court of Appeal that the injunction issued by the trial court must be reversed in part, but we reach that conclusion based on different reasoning than that relied upon by the Court of Appeal. As explained above, the injunction must be reversed in part because it is overly broad, but a properly limited injunction prohibiting defendant from repeating statements about plaintiff that were determined at trial to be defamatory would not violate defendant's right to free speech.

### DISPOSITION

The judgment of the Court of Appeal is affirmed, and the matter remanded for proceedings consistent with the views expressed in this opinion.

George, C. J., Baxter, J., Chin, J., and Corrigan, J., concurred.

**BAXTER, J., Concurring.**—I join fully in the majority opinion. I write separately only to point out that if a defendant were to be enjoined from repeating statements already determined to be defamatory, such a defendant may not only move the court to modify or dissolve the injunction based on a change in circumstances or context, as the majority notes, but may also speak out, notwithstanding the injunction, and assert the present truth of those statements as a defense in any subsequent prosecution for violation of the injunction. (*People v. Gonzalez* (1996) 12 Cal.4th 804, 818 [50 Cal.Rptr.2d 74, 910 P.2d 1366] ["this court has firmly established that a person subject to a court's injunction may elect whether to challenge the constitutional validity of the injunction when it is issued, or to reserve that claim until a violation of the injunction is charged as a contempt of court"]; see *In re Berry* (1968) 68 Cal.2d 137, 149–150 [65 Cal.Rptr. 273, 436 P.2d 273].)

Our decision thus does *not* require a citizen to obtain government permission before speaking truthfully. In this respect, California law "is 'considerably more consistent with the exercise of First Amendment freedoms' than that of other jurisdictions that have adopted the so-called collateral bar rule barring collateral attack on injunctive orders." (*People v. Gonzalez, supra,* 12 Cal.4th at p. 819, quoting *In re Berry, supra,* 68 Cal.2d at p. 150.)

George, C. J., and Chin, J., concurred.

**KENNARD, J., Concurring and Dissenting.**—In this defamatory speech action, the Court of Appeal invalidated the trial court's permanent injunction against defendant. The majority here affirms the Court of Appeal's judgment. So would I.

Unlike the majority, however, I would not remand the matter for issuance of a narrower injunction. Rather, I agree with the Court of Appeal that an

injunction permanently prohibiting defendant's future speech is an unconstitutional prior restraint. And, unlike the majority, I would hold that the remedy for defamation is to award monetary damages. To forever gag the speaker—the remedy approved by the majority—goes beyond chilling speech; it freezes speech.

The majority acknowledges that the statements the trial court has prohibited defendant from uttering may in the future become true. In that event, the majority concludes, defendant has an adequate remedy because she may apply to the trial court for modification of the injunction. I disagree. To require a judge's permission before defendant may speak truthfully is the essence of government censorship of speech and in my view is constitutionally impermissible.

# I

Plaintiff Balboa Island Village Inn, Inc., owns the Balboa Island Village Inn (Village Inn), a bar and restaurant on Balboa Island in Newport Beach, Southern California. The Village Inn has live music, and on weekends it stays open until 2:00 a.m. Defendant Anne Lemen (Lemen) has since 1989 owned a cottage across an alley from the Village Inn. Lemen lives in the cottage part of the time and rents it out as a vacation home part of the time.

Like the previous owners of her home, Lemen became embroiled in a dispute with plaintiff about noise at the Village Inn. She also complained about the inebriation and boisterousness of departing customers. Lemen circulated a petition on Balboa Island, which has about 1100 residents, and obtained, as plaintiff's counsel acknowledged at oral argument, 400 signatures. While circulating the petition, and at other times, Lemen orally accused plaintiff of, among other things, having child pornography and prostitution at the Village Inn, selling drugs and alcohol to minors there, and being involved with the Mafia.

Plaintiff sued Lemen, alleging causes of action for nuisance, interference with business, and defamation. Although plaintiff claimed that the Village Inn experienced a 20 percent drop in business after Lemen circulated her petition and made her oral accusations (maj. opn., *ante,* at p. 1145), it sought no monetary damages whatsoever. The sole remedy it sought, and obtained, was a permanent injunction ordering Lemen to stop making disparaging statements about the Village Inn. (Maj. opn., *ante,* at p. 1158.)

The trial court prohibited Lemen from contacting Village Inn employees, an order that the Court of Appeal invalidated as an overbroad restriction. The trial court also permanently enjoined Lemen from making the following

statements about plaintiff to third persons: "Plaintiff sells alcohol to minors; Plaintiff stays open until 6:00 a.m.; Plaintiff makes sex videos; Plaintiff is involved in child pornography; Plaintiff distributes illegal drugs; Plaintiff has Mafia connections; Plaintiff encourages lesbian activities; Plaintiff participates in prostitution and acts as a whorehouse; Plaintiff serves tainted food." The Court of Appeal held that these restrictions on Lemen's future speech are a constitutionally impermissible prior restraint of speech.

The majority agrees with the Court of Appeal that the trial court's permanent injunction is unconstitutional. But it does so based only on the overbreadth of the injunction in applying to persons other than Lemen herself; in restricting Lemen's contacts with plaintiff's employees regardless of time, place, or manner; and in prohibiting Lemen from making the specified statements even to government officials. (Maj. opn., *ante*, at pp. 1159–1161.) The majority, however, rejects the Court of Appeal's holding that the injunction is an unconstitutional prior restraint. (*Id.* at p. 1156.) It holds: (1) After a trial court has once found a defendant's statement to be defamatory, it may order the defendant never to repeat that statement (*ibid.*); (2) future speech may be enjoined irrespective of whether monetary damages would have been an adequate remedy (*id.* at p. 1158); and (3) a defendant's truthful future speech may be subjected to judicial censorship (*id.* at pp. 1160–1161).

I do not and cannot join those majority holdings, which I view as restraints on the right of free speech that are impermissible under both the federal and the California Constitutions. The majority orders the matter remanded so that the trial court may prepare and file a new permanent injunction against Lemen that avoids the overbreadth problems that the majority has identified. I do not agree with the remand. Even as so limited, the injunction operates as an impermissible prior restraint of Lemen's future speech.

## II

To speak openly and freely, one of our most cherished freedoms, is a right guaranteed by the First Amendment to the United States Constitution. (U.S. Const., 1st Amend. ["Congress shall make no law . . . abridging the freedom of speech . . . ."].) This fundamental right operates as a restriction on both state and federal governments (*Near v. Minnesota* (1931) 283 U.S. 697, 732 [75 L.Ed. 1357, 51 S.Ct. 625]), including the judicial, legislative, and executive branches of those governments (*Madsen v. Women's Health Center, Inc.* (1994) 512 U.S. 753, 764 [129 L.Ed.2d 593, 114 S.Ct. 2516]).

Injunctions pose a greater threat to freedom of speech than do statutes, as injunctions carry a greater risk of censorship and discriminatory application

than do general laws. (*Madsen v. Women's Health Center, Inc., supra,* 512 U.S. at pp. 764–765.) An injunction is issued not by the collective action of a legislature but by an individual judge—a single man or woman controlling someone's future utterances of speech. Because the power to enjoin speech resides in an individual judge, injunctions deserve greater scrutiny than statutes. (See *id.* at p. 793 (conc. & dis. opn. of Scalia, J.).) An injunction restricting future speech is a prior restraint (*id.* at p. 797 (conc. & dis. opn. of Scalia, J.)) and thus, presumptively unconstitutional (*Southeastern Promotions, Ltd. v. Conrad* (1975) 420 U.S. 546, 558 [43 L.Ed.2d 448, 95 S.Ct. 1239]).

The majority's insistence to the contrary notwithstanding (maj. opn., *ante,* at p. 1148), the injunction here is a prior restraint because it prohibits Lemen from making specified statements (*ante,* at p. 1146) anywhere and at any time in the future. A prohibition targeting speech that has not yet occurred is a prior restraint. (*Alexander v. United States* (1993) 509 U.S. 544, 550 [125 L.Ed.2d 441, 113 S.Ct. 2766] [court orders that actually forbid speech activities are classic examples of prior restraints]; see *Tory v. Cochran* (2005) 544 U.S. 734, 736 [161 L.Ed.2d 1042, 125 S.Ct. 2108, 2110] [injunction against " 'orally uttering statements' " is a prior restraint].)

The pertinent inquiry is whether the presumptively unconstitutional prior restraint (*Southeastern Promotions, Ltd. v. Conrad, supra,* 420 U.S. at p. 558; *Bantam Books, Inc. v. Sullivan* (1963) 372 U.S. 58, 70 [9 L.Ed.2d 584, 83 S.Ct. 631]) on Lemen's future speech is legally proper. A heavy burden of justification rests on anyone seeking a prior restraint on the right of free speech. (*Organization for a Better Austin v. Keefe* (1971) 402 U.S. 415, 419 [29 L.Ed.2d 1, 91 S.Ct. 1575].) Here, plaintiff has not carried that burden. Plaintiff's argument, adopted by the majority, consists in essence of this syllogism: (1) Defamation is not constitutionally protected speech; (2) it has been judicially determined that Lemen defamed plaintiff by making certain statements; therefore (3) defendant may be enjoined from ever again making those statements. (Maj. opn., *ante,* at pp. 1155–1156.) Like many a syllogism, the argument has superficial appeal. Like many a syllogism, it is flawed.

Its flaw is the failure to appreciate that whether a statement is defamatory cannot be determined by viewing the statement in isolation from the context in which it is made, the facts to which it refers, and the precise wording used. A statement previously adjudged to be defamatory, and thus not protected by the First Amendment, may, when spoken in the future at a particular time and in a particular context, not be defamatory for a number of reasons, and thus be entitled to constitutional protection.

The underlying facts to which the statement refers may change. Here, for example, the trial court enjoined Lemen from ever saying that plaintiff sells

alcohol to minors at the Village Inn. If in the future the Village Inn were ever to serve alcohol to minors, and Lemen accurately reported that fact to a neighbor, Lemen could be charged with contempt of court for violating the trial court's injunction, even though her statement was not defamatory (because true) and thus entitled to full constitutional protection.

And the context in which the words are spoken may be different. For an audience member to falsely yell "fire" in a crowded theater is quite different than for an actor to yell the same word in the same crowded theater while reciting the lines of a dramatic production. Similarly, if a newspaper reporter were to ask Lemen what sorts of things the trial court's injunction prohibited her from saying, and if Lemen were to reply, "Plaintiff sells alcohol to minors," the statement would not be defamatory because a reasonable person hearing the conversation would understand that Lemen was describing the contents of the injunction and not the activities at the Village Inn. (See *Couch v. San Juan Unified School Dist.* (1995) 33 Cal.App.4th 1491, 1501 [39 Cal.Rptr.2d 848] [whether an oral statement is defamatory depends on how a reasonable hearer would understand it in the context in which it was spoken].) In other words, whether the First Amendment protects speech depends on the setting in which the speech occurs. (*Young v. American Mini Theatres, Inc.* (1976) 427 U.S. 50, 66 [49 L.Ed.2d 310, 96 S.Ct. 2440]; *Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 260 [228 Cal.Rptr. 206, 721 P.2d 87] [statement must be examined in light of the " 'totality of the circumstances' "].) Because the injunction here makes no allowance for context, it muzzles nondefamatory speech entitled to full constitutional protection.

Also, the words in which a statement is formulated may vary. Subtle differences in wording can make it exceptionally difficult to determine whether a particular utterance falls within an injunction's prohibition. As the United States Supreme Court has aptly observed: "It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable." (*Southeastern Promotions, Ltd. v. Conrad, supra,* 420 U.S. at p. 559; accord, *Young v. American Mini Theatres, Inc., supra,* 427 U.S. at p. 66.) For example, should in this case Lemen express in the future her opinion that bars such as the Village Inn contribute to the social problems arising from alcoholic consumption by minors, has Lemen violated the injunction? Does that assertion imply that the Village Inn sells alcohol to minors or only that the general availability of alcohol in all bars, including the Village Inn, contributes to the social problems caused by alcohol? If Lemen were to tell a friend that the food at the Village Inn is "bad," would that statement imply that the food is "tainted" (a statement that the injunction forbids) or only that it is unappetizing or ill-flavored (statements that the injunction does not forbid)?

The United States Supreme Court's decisions recognize that an injunction may not be used to prohibit speech that, because its precise content is not yet known, might be constitutionally protected. Thus, in *Kingsley Books, Inc. v. Brown* (1957) 354 U.S. 436 [1 L.Ed.2d 1469, 77 S.Ct. 1325], the high court upheld an injunction of "written and printed matter found after due trial to be obscene" (*id.* at p. 437) because the injunction "studiously withholds restraint upon matters *not already published* and not yet found to be offensive" (*id.* at p. 445, italics added).

When, as here, an injunction based on *past* oral statements found to be defamatory, and therefore unprotected by the First Amendment, restrains *future* speech that, because it has not yet occurred, has not been judicially determined to be unprotected, the high court has held the injunction to be an unconstitutional prior restraint. (*Vance v. Universal Amusement Co.* (1980) 445 U.S. 308, 311, 316 [63 L.Ed.2d 413, 100 S.Ct. 1156]; *Near v. Minnesota, supra,* 283 U.S. 697; see *Alexander v. United States, supra,* 509 U.S. at p. 550; *Kingsley Books, Inc. v. Brown, supra,* 354 U.S. at p. 445.) The threat of contempt of court proceedings, which may result in fines and incarceration, necessarily discourages or chills the exercise of free speech and may deter a person from speaking at all. The First Amendment does not permit "banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process." (*Ashcroft v. Free Speech Coalition* (2002) 535 U.S. 234, 255 [152 L.Ed.2d 403, 122 S.Ct. 1389].) A prior restraint does more than chill the exercise of free speech: "If it can be said that a threat of criminal or civil sanctions after publication 'chills' speech, prior restraint 'freezes' it at least for the time." (*Nebraska Press Assn. v. Stuart* (1976) 427 U.S. 539, 559 [49 L.Ed.2d 683, 96 S.Ct. 2791].)

In response to plaintiff's argument that changed circumstances may in the future render true a statement that was in the past false, the majority requires Lemen to seek the trial court's permission before she speaks by moving to modify the injunction. (Maj. opn., *ante,* at p. 1161.) Requiring a citizen to obtain government permission before speaking truthfully is "the essence of censorship" directly at odds with the "chief purpose" of the constitutional guarantee of free speech to prevent prior restraints. (*Near v. Minnesota, supra,* 283 U.S. at p. 713; see *Kingsley Books, Inc. v. Brown, supra,* 354 U.S. at p. 445.)[1]

---

[1] The concurring opinion asserts that, because California permits collateral attacks on the constitutionality of injunctions, the majority's decision does not require Lemen to obtain government permission before speaking truthfully. (Conc. opn. of Baxter, J., *ante,* at p. 1162.) This assertion implicitly recognizes that the injunction is unconstitutionally overbroad because it enjoins speech whether or not it is truthful. What it fails to recognize, however, is the powerfully chilling effect of an injunction restricting speech. To speak truthfully in violation of the injunction, Lemen must be willing to be cited for contempt, hauled into court, and face

Not only does the injunction against Lemen's future speech offend the basic principles of the First Amendment, it also violates the First Amendment because it is unnecessary, as discussed below.

## III

The injunction here is not necessary to protect any compelling state interest or any important public policy. (See *Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 165–166 [87 Cal.Rptr.2d 132, 980 P.2d 846] (conc. opn. of Werdegar, J.) [compelling state interest in eradicating racial discrimination in workplace]; *id.*, at p. 180 (dis. opn. of Kennard, J.) [compelling state interest in eradicating invidious employment discrimination].) The injunction in this case serves no significant public interest, such as eliminating invidious racial discrimination in employment, preventing incitement of immediate violence, or protecting national security. Obviously, there is no compelling public or state interest in stopping Lemen from circulating a petition among her neighbors and making disparaging statements about the Village Inn. The injunction only protects plaintiff's purely private business interests.

Plaintiff has not shown that the injunction is necessary to serve even those private interests, because plaintiff has not demonstrated that monetary damages would be an inadequate remedy. Although plaintiff claimed it suffered a 20 percent loss in business revenue after Lemen circulated her petition among the residents of Balboa Island and orally disparaged the Village Inn, plaintiff did not seek any monetary damages from Lemen. The only relief plaintiff sought was a permanent injunction. Entitlement to such relief, however, requires a showing "that the defendant's wrongful acts threaten to cause *irreparable* injuries, ones that cannot be adequately compensated in damages." (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1352 [1 Cal.Rptr.3d 32, 71 P.3d 296].) Here, neither plaintiff nor the majority claims that such a showing has been made. The majority is wrong in asserting (maj. opn., *ante*, at p. 1158) that an injunction may issue without a showing of irreparable injury—that is, that damages are inadequate. The " 'extraordinary remedy of injunction' cannot be invoked without showing the likelihood of irreparable harm." (*Intel Corp. v. Hamidi, supra*, at p. 1352.)

The majority relieves plaintiff of its obligation to establish that damages are not an adequate remedy by asserting that a defendant harmed by defamation could be required to bring a series of lawsuits or that damages

possible incarceration and fines. How many will be bold enough to run those risks? Realistically, the majority's decision does require persons like Lemen to obtain government permission before speaking truthfully.

would not deter a defendant who is too poor to pay damages or "so wealthy as to be willing to pay any resulting judgments." (Maj. opn., *ante,* at p. 1158.) I disagree.

The majority points to nothing in this record that would support the conclusion that, if damages had been awarded, Lemen would again have defamed plaintiff, requiring plaintiff to bring another lawsuit. In the absence of substantial evidence, or any evidence, relevant to this issue, it cannot be assumed that an award of actual damages would not deter Lemen. To the contrary, compensatory damages awards, when added to the high costs of defending lawsuits and the risk of future punitive damage awards, are powerful deterrents.

Nor is there any basis for concluding that Lemen is either too poor to pay damages or so rich that a damage award would not serve as a deterrent. From her ownership of Balboa Island property we may infer that Lemen is not too poor to pay a damage award, and nothing in the appellate record suggests she is so wealthy that a compensatory damage award would not deter her from making defamatory statements about the Village Inn. In addition, so far as I am aware, neither this nor any other court has ever held that a defendant's wealth can justify a prior restraint on the constitutional right to free speech. (See *Willing v. Mazzocone* (1978) 482 Pa. 377 [393 A.2d 1155, 1158] ["In Pennsylvania the insolvency of a defendant does not create a situation where there is no adequate remedy at law"].)

Thus, the injunction here violates the First Amendment to the United States Constitution's guarantee of free speech for a second reason—because it is unnecessary. Its invalidity is even clearer under the free speech provisions of the California Constitution, provisions that are more stringent than even those of the federal Constitution.

## IV

The California Constitution's guarantee of the right to free speech and press is more protective and inclusive than that contained in the First Amendment to the federal Constitution. (*Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 490–493 [101 Cal.Rptr.2d 470, 12 P.3d 720]; *Wilson v. Superior Court* (1975) 13 Cal.3d 652, 658 [119 Cal.Rptr. 468, 532 P.2d 116].) Our constitutional guarantee states: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." (Cal. Const., art. I, § 2, subd. (a).)

This court has long recognized that under our state Constitution's free speech guarantee (Cal. Const., art. I, § 2, subd. (a)) a person may be held

responsible in damages for what the person says, writes, or publishes but cannot be censored by a prior restraint. "The wording of this section is terse and vigorous, and its meaning so plain that construction is not needed. The right of the citizen to freely speak, write, and publish his sentiments is unlimited, but he is responsible at the hands of the law for an abuse of that right. He shall have no censor over him to whom he must apply for permission to speak, write, or publish, but he shall be held accountable to the law for what he speaks, what he writes, and what he publishes. It is patent that this right to speak, write, and publish, cannot be abused until it is exercised, and before it is exercised there can be no responsibility. The purpose of this provision of the constitution was the abolishment of censorship, and for courts to act as censors is directly violative of that purpose." (*Dailey v. Superior Court* (1896) 112 Cal. 94, 97 [44 P. 458].)

The majority errs in claiming that this court's interpretation of the state constitutional free speech guarantee in *Dailey v. Superior Court, supra,* 112 Cal. 94, is no longer controlling. (Maj. opn., *ante,* at p. 1159.) Misplaced is the majority's reliance on this court's decision in *People ex rel. Busch v. Projection Room Theater* (1976) 17 Cal.3d 42 [130 Cal.Rptr. 328, 550 P.2d 600] (*Busch*) and on the plurality opinion in *Aguilar v. Avis Rent A Car System, Inc., supra,* 21 Cal.4th 121 (plur. opn. of George, C. J.). *Busch* concerned an injunction to prohibit the exhibition of particular obscene magazines and films (*Busch, supra,* at pp. 48–49), not an injunction prohibiting future speech that might or might not be defamatory. Moreover, the majority in *Busch* did not consider, apply, or even cite our state constitutional provision. With respect to the *Aguilar* plurality opinion, it made the same fundamental mistakes the majority repeats here. Because it was only a plurality opinion, it lacks authority as precedent.

The injunction at issue here (both as entered by the trial court and as it will be after the majority's required modifications are made) violates our state Constitution's free speech guarantee as authoritatively construed in *Dailey v. Superior Court, supra,* 112 Cal. 94. As I have explained, the injunction is a prior restraint on future speech; it is overbroad in prohibiting nondefamatory future speech; and it is unnecessary in the absence of proof that compensatory damages would not be an adequate remedy. Moreover, the majority does not cure, but only exacerbates, the injunction's unconstitutional features by requiring the trial court to act as a censor of Lemen's future speech. Because our state Constitution prohibits prior restraints and government censorship, the injunction also violates the California Constitution.

I would affirm the judgment of the Court of Appeal.

**WERDEGAR, J., Concurring and Dissenting.**—For reasons that will appear, I concur in the disposition. However, finding the majority's analysis flawed, I otherwise dissent.

A little more than seven years ago, a bare majority of this court "sail[ed] into uncharted First Amendment waters" (*Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 148 [87 Cal.Rptr.2d 132, 980 P.2d 846] (conc. opn. of Werdegar, J.) (*Aguilar*)) and held that despite the free speech guarantee in the First Amendment to the United States Constitution, an injunction prohibiting a person from uttering certain words or phrases in the future was permissible. In that case, the defendant had been found guilty of employment discrimination in violation of the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.) for directing racially derogatory comments at his Latino employees at their workplace. A plurality of three justices found the injunction in *Aguilar* permissible under the First Amendment because the jury, having found a FEHA violation, necessarily found the defendant's racial comments were unprotected speech. The plurality reasoned: "[T]he injunction at issue is not an invalid prior restraint, because the order was issued only after the jury determined that defendant[] had engaged in employment discrimination, and the order simply precluded defendant[] from continuing [his] unlawful activity." (*Aguilar*, at p. 138; see also *id.* at p. 140 ["once a court has found that a specific pattern of speech is unlawful, an injunctive order . . . is not a prohibited 'prior restraint' of speech"]; *id.* at p. 147 [because the speech "had been judicially determined to violate the FEHA," the injunction "does not constitute an invalid prior restraint of speech"].)

Three justices of this court dissented, each writing separate opinions; all concluded that notwithstanding the jury's decision finding a FEHA violation, the trial court's injunction constituted an impermissible prior restraint on speech in violation of the defendant's First Amendment rights. The late Justice Mosk concluded "the injunction fail[ed] to overcome the heavy presumption against the constitutional validity of prior restraints on speech." (*Aguilar*, *supra*, 21 Cal.4th at p. 173 (dis. opn. of Mosk, J.).) Justice Kennard opined that "the high court's decisions do not support the broad proposition that viewpoint-based remedial injunctions are exempt from strict First Amendment scrutiny simply because they are issued against a person who has once been found to have engaged in speech that produced or contributed to a hostile work environment." (*Id.* at p. 186 (dis. opn. of Kennard, J.).) Justice Brown likewise rejected the plurality's rationale that an adjudication of a FEHA violation justified imposition of the injunction on future speech. (*Id.* at p. 193 (dis. opn. of Brown, J.).)

I, too, wrote separately in *Aguilar*, but a concurrence, not a dissent. Although I found the injunction to be constitutionally permissible in the particular circumstances, I did not join the plurality's analysis elevating the jury's FEHA verdict into a constitutional license to enjoin the defendant's future speech. Instead, recognizing that the case posed two constitutionally protected interests in tension with each other—the defendant's right to free speech versus the plaintiffs' right to be free of racial discrimination—I concluded that "[g]iven the constellation of factors present in this case, no clear reason appears why [the defendant's] free speech rights should predominate over the state's and the individual plaintiffs' similarly weighty antidiscrimination interests. [¶] Balancing [the defendant's] First Amendment free speech rights with the equally weighty right of [the] plaintiffs to be let alone at their jobsite, free of racial discrimination, I find the several factors coalescing in this case—speech occurring in the workplace, an unwilling and captive audience, a compelling state interest in eradicating racial discrimination, and ample alternative speech venues for the speaker—support the conclusion that the injunction, if sufficiently narrowed on remand to apply to the workplace only, will pass constitutional muster." (*Aguilar, supra,* 21 Cal.4th at p. 166 (conc. opn. of Werdegar, J.).)

Because I did not join the plurality opinion in *Aguilar*, only three justices of this court agreed with the proposition that a jury determination a person's speech was unlawful (in that case, that the defendant's speech created a hostile work environment in violation of FEHA), *by itself*, permitted a court to enjoin that person from engaging in similar speech in the future. Instead, a majority of this court—myself, along with the three *Aguilar* dissenters—expressly rejected that reasoning. Accordingly, the Court of Appeal below, reading the plurality opinion and my concurring opinion together, accurately characterized *Aguilar* as "support[ing] the principle that a content-based injunction restraining speech is constitutionally valid if the speech has been adjudicated to violate a specific statutory scheme expressing a compelling state interest justifying a prior restraint on speech, or when necessary to protect a right equal in stature to the right of free speech secured by the First Amendment to the United States Constitution."

Unlike in *Aguilar*, where we were called on to balance countervailing constitutional concerns with the demands of the First Amendment free speech guarantee, the present case involves a garden-variety defamation under state law. Defendant was shown in a court trial to have made false and defamatory statements to several people, including plaintiff's customers, regarding activities occurring in plaintiff's restaurant. She also made false and injurious comments about the cleanliness and wholesomeness of the food served therein. While our Legislature reasonably has determined such utterances are

inimical to the social order and justify a civil remedy,[1] that state interest is not one of federal constitutional dimension and must surrender to the greater constitutional interest as expressed · in the First Amendment. Unlike in *Aguilar*, where the plaintiffs plausibly could argue the Constitution protected their interests as well as the defendants', plaintiff in this case cannot wield the Constitution as its sword.

Nor are any of the other considerations that rendered *Aguilar* an unusual case present here. Thus, although the speech in *Aguilar* occurred at the workplace where "special considerations . . . sometimes permit greater restrictions on First Amendment rights" (*Aguilar, supra*, 21 Cal.4th at p. 156 (conc. opn. of Werdegar, J.)), defendant Anne Lemen's speech in this case occurred largely in and around the streets and sidewalks near the restaurant, places that are presumptively open to free speech. (*International Soc. for Krishna Consciousness, Inc. v. Lee* (1992) 505 U.S. 672, 679 [120 L.Ed.2d 541, 112 S.Ct. 2711].) Nor do plaintiff or its customers comprise a captive audience, a circumstance that might justify "greater restrictions on a speaker's freedom of expression." (*Aguilar*, at p. 159 (conc. opn. of Werdegar, J.); *Frisby v. Schultz* (1988) 487 U.S. 474, 487 [101 L.Ed.2d 420, 108 S.Ct. 2495] ["The First Amendment permits the government to prohibit offensive speech as intrusive when the 'captive' audience cannot avoid the objectionable speech"].) Plaintiff does not allege defendant uttered her defamatory statements while inside the restaurant, where diners could plausibly claim to be a captive audience. Finally, the injunction prohibiting Lemen from repeating her defamatory statements is not, as in *Aguilar*, akin to a time, place and manner restriction (*Aguilar*, at p. 162 (conc. opn. of Werdegar, J.); *Madsen v. Women's Health Center, Inc.* (1994) 512 U.S. 753 [129 L.Ed.2d 593, 114 S.Ct. 2516]), but is more like a gag order, judicially enforced.

An injunction such as the one imposed in this case, of course, constitutes a prior restraint on speech. (*Alexander v. United States* (1993) 509 U.S. 544, 550 [125 L.Ed.2d 441, 113 S.Ct. 2766] ["permanent injunctions . . . are classic examples of prior restraints"].) In the absence of a compelling constitutional interest supporting plaintiff's interests as well as the unusual aggregation of other factors present in *Aguilar, supra*, 21 Cal.4th 121, the traditional First Amendment protection against prior restraints on speech should apply in full. "Any system of prior restraint . . . 'comes to this Court bearing a heavy presumption against its constitutional validity.' *Bantam Books, Inc. v. Sullivan*, 372 U.S. [58], at 70 [9 L.Ed.2d 584, 83 S.Ct. 631] [(1963)]; *New York Times Co. v. United States*, 403 U.S. [713], at 714 [29 L.Ed.2d 822, 91 S.Ct. 2140] [(1971)]; [citations]. The presumption against prior restraints is heavier—and the degree of protection broader—than that against limits on expression

---

[1] Thus, Civil Code sections 44 to 46 set forth the civil torts of defamation and libel under state law.

imposed by criminal penalties. Behind the distinction is a theory deeply etched in our law: a free society prefers to punish the few who abuse rights of speech *after* they break the law than to throttle them and all others beforehand. It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable." (*Southeastern Promotions, Ltd. v. Conrad* (1975) 420 U.S. 546, 558–559 [43 L.Ed.2d 448, 95 S.Ct. 1239].)

It has long been the rule that "[a] court cannot enjoin the publication of a libel." (*People v. Superior Court* (*1973 Grand Jury*) (1975) 13 Cal.3d 430, 446 [119 Cal.Rptr. 193, 531 P.2d 761].) As the high court explained more than a century ago: "If the publications in the newspapers are false and injurious, he can prosecute the publishers for libel. If a court of equity could interfere and use its remedy of injunction in such cases, it would draw to itself the greater part of the litigation properly belonging to courts of law." (*Francis v. Flinn* (1886) 118 U.S. 385, 389 [30 L.Ed. 165, 6 S.Ct. 1148]; see also *Metropolitan Opera Ass'n, Inc. v. Local 100* (2d Cir. 2001) 239 F.3d 172, 177 ["courts have long held that equity will not enjoin a libel"].) As the Court of Appeal below explained: "This rule rests 'in large part on the principle that injunctions are limited to rights that are without an adequate remedy at law, and because ordinarily libels may be remedied by damages, equity will not enjoin a libel absent extraordinary circumstances.' " This rule is set forth in this state's statutory law; Code of Civil Procedure section 526, subdivision (a)(4) provides: "An injunction may be granted in the following cases: [¶] . . . [¶] (4) When pecuniary compensation would not afford adequate relief."

The majority provides an interesting historical explanation for the long-standing rule that equity will not enjoin defamation. (Maj. opn., *ante*, at pp. 1156–1157.) But though law and equity courts presided over separate domains hundreds of years ago in England, and our state's superior courts have more comprehensive jurisdiction today, I do not read the majority opinion as advocating, based on this historical analysis, the wholesale abandonment of the rule against enjoining defamation. More importantly, irrespective of whether modern courts have *jurisdiction* to enjoin a person's future statements, in exercising that jurisdiction they must factor in the person's First Amendment right to free speech, a concern not applicable in the 18th and 19th century English Court of Common Pleas or in our state courts before 1925. (See *Gitlow v. New York* (1925) 268 U.S. 652, 666 [69 L.Ed. 1138, 45 S.Ct. 625] [applying the First Amendment to the states]; *Aguilar, supra,* 21 Cal.4th at p. 150 (conc. opn. of Werdegar, J.).)

The majority concedes the issue we decide today is of first impression, noting that "[t]he United States Supreme Court has never addressed the

precise question before us—whether an injunction prohibiting the repetition of statements found at trial to be defamatory violates the First Amendment." (Maj. opn., *ante*, at p. 1151.)[2] In this legal vacuum, the majority resorts to reasoning by analogy, citing situations in which the United States Supreme Court in resolving "related questions" has approved injunctions on a person's future speech. (Maj. opn., *ante*, at p. 1151.) As I explain, the analogies are flawed and the legal authority cited by the majority does not authorize a court to impose an injunction against future defamation.

The majority first analogizes to cases involving speech found to be obscene. (Maj. opn., *ante*, at pp. 1151–1152.) Those familiar with this area of the law know the high court has traveled a twisting, rocky road during the last 50 years in its attempt to enunciate both a coherent explanation for, and the proper limits on, government suppression of obscene and sexually explicit speech. (See, e.g., *Roth v. United States* (1957) 354 U.S. 476, 484 [1 L.Ed.2d 1498, 77 S.Ct. 1304] [obscenity unprotected by First Amendment if "utterly without redeeming social importance"]; *Jacobellis v. Ohio* (1964) 378 U.S. 184, 197 [12 L.Ed.2d 793, 84 S.Ct. 1676] (conc. opn. of Stewart, J.) [conceding he "perhaps . . . could never succeed in intelligibly" defining obscenity, but opining that "I know it when I see it"]; *Miller v. California* (1973) 413 U.S. 15 [37 L.Ed.2d 419, 93 S.Ct. 2607] [partially overruling *Roth* and establishing the modern test for obscenity]; *Reno v. American Civil Liberties Union* (1997) 521 U.S. 844 [138 L.Ed.2d 874, 117 S.Ct. 2329] [invalidating portions of the Communications Decency Act of 1996, which attempted to regulate obscenity on the Internet].)

The majority accurately observes the United States Supreme Court has permitted the issuance of injunctions prohibiting defendants from selling books, magazines and films adjudged obscene. (*Paris Adult Theatre I v. Slaton* (1973) 413 U.S. 49 [37 L.Ed.2d 446, 93 S.Ct. 2628]; *Kingsley Books, Inc. v. Brown* (1957) 354 U.S. 436 [1 L.Ed.2d 1469, 77 S.Ct. 1325].) The majority reads these precedents for all they could mean, reasoning that, as with obscenity, once a trier of fact has decided that some particular speech falls within a category unprotected by the First Amendment (here, defendant's defamatory comments), an injunction is permissible to prohibit future utterances. But *Paris Adult Theatre I* and *Kingsley Books* have never been read to authorize such broad limits on speech outside the category of obscene speech. For example, in *Snepp v. United States* (1980) 444 U.S. 507 [62 L.Ed.2d 704, 100 S.Ct. 763], the high court considered an author's breach of an agreement

---

[2] The high court recently granted certiorari in a case to decide " '[w]hether a permanent injunction as a remedy in a defamation action, preventing all future speech about an admitted public figure, violates the First Amendment.' " (*Tory v. Cochran* (2005) 544 U.S. 734, 736 [161 L.Ed.2d 1042, 125 S.Ct. 2108].) The court vacated and remanded the case without resolving the First Amendment issue because the plaintiff passed away during the pendency of the appeal. (544 U.S. at pp. 738–739.)

with the Central Intelligence Agency to submit his book to the agency for prepublication clearance. In approving equitable relief as a remedy for the breach (in that case a constructive trust on booksale profits rather than an injunction), the high court did not cite any obscenity case in support. The majority today cites no United States Supreme Court case in which *Paris Adult Theatre I* or *Kingsley Books* is cited as authority justifying an injunction on future speech outside the area of obscenity.

Moreover, the high court's approval of injunctive relief for obscenity must be viewed in the larger context, in which it has permitted other forms of government regulation of obscene and sexually explicit speech that would likely be found unconstitutional if applied to other forms of speech. For example, the high court has held it permissible for a state to require all films, subject to certain limitations, be submitted to a censor board before exhibition. (*Freedman v. Maryland* (1965) 380 U.S. 51 [13 L.Ed.2d 649, 85 S.Ct. 734]; see also *Alexander v. United States, supra,* 509 U.S. 544 [authorizing seizure and destruction of business assets, including nonobscene material, following conviction for selling obscene material]; *Renton v. Playtime Theatres, Inc.* (1986) 475 U.S. 41 [89 L.Ed.2d 29, 106 S.Ct. 925] [upholding government zoning to regulate secondary effects of sexually explicit, though not necessarily obscene, speech]; *Heller v. New York* (1973) 413 U.S. 483 [37 L.Ed.2d 745, 93 S.Ct. 2789] [authorizing seizure of a copy of a film even before judicial determination the film is obscene].) We need not here decide whether the court's approval of these remedial measures aimed at curbing obscene speech is a function of the unique history of the regulation of obscene speech or the somewhat unique commercial and financial incentives[3] connected to such speech. It is enough to conclude that cases addressing the problem of obscene speech are not broadly applicable to all other forms of unprotected speech and thus provide no direct analogy to the question of the permissible remedies for defamation. Accordingly, the mere fact a court may enjoin the sale of a book or film found obscene does not, without more, provide persuasive authority for concluding a court may also enjoin a person from speaking, in the future, words or phrases found in the past to have been defamatory.

---

[3] See, e.g., *New York v. Ferber* (1982) 458 U.S. 747, 756, 761 [73 L.Ed.2d 1113, 102 S.Ct. 3348] ("States are entitled to greater leeway in the regulation of pornographic depictions of children" in part because the "advertising and selling of child pornography provide an *economic motive* for and are thus an integral part of the production of such materials, an activity illegal throughout the Nation" (italics added)). (Cf. *Leonardini v. Shell Oil Co.* (1989) 216 Cal.App.3d 547, 574 [264 Cal.Rptr. 883] ["One of the important differences between trade libel on the one hand and defamation on the other, is said to be that 'because of the *economic interest involved,* the disparagement of quality may in a proper case be enjoined, whereas personal defamation can not [*sic*].' " (Italics added.)].)

The majority also cites *Pittsburgh Press Co. v. Human Rel. Comm'n* (1973) 413 U.S. 376 [37 L.Ed.2d 669, 93 S.Ct. 2553] in support. (Maj. opn., *ante*, at p. 1152.) But that case posed a plaintiff asserting a counterbalancing constitutional claim (sex discrimination) against a defendant claiming the right to free speech. As the Court of Appeal below recognized, my concurring opinion in *Aguilar* is "consistent with *Pittsburgh Press*, which concluded the challenged advertising lost any First Amendment protection because it violated a municipal ordinance prohibiting sex-based discrimination." Because plaintiff here asserts no such constitutional claim in support, *Pittsburgh Press* is not at all analogous to the present case and provides no persuasive support for the requested injunction here.

In the absence of any of the unusual factors present in *Aguilar, supra,* 21 Cal.4th 121, or any compelling United States Supreme Court authority, it is inescapable that the injunction here is an impermissible prior restraint on defendant's speech. Although prior restraints on speech are not categorically prohibited in all cases (see, e.g., *DVD Copy Control Assn., Inc. v. Bunner* (2003) 31 Cal.4th 864, 890 [4 Cal.Rptr.3d 69, 75 P.3d 1] (conc. opn. of Werdegar, J.) [First Amendment "does not necessarily preclude injunctive relief in trade secret cases"]), the party moving for such relief bears a heavy burden. (See *New York Times Co. v. United States, supra,* 403 U.S. 713 [the Pentagon Papers case].) Plaintiff does not carry this burden here.

Although plaintiff, a business operating a restaurant, claims it lost money as a result of defendant's defamatory comments, it has not shown why it cannot be made whole by damages. (Code Civ. Proc., § 526, subd. (a)(4).) If plaintiff lost money, customers or goodwill due to defendant's defamatory comments, she can be made to pay damages. If, after paying damages, defendant continues to utter defamatory statements and it is proved she did so intentionally and maliciously, the law provides for punitive damages. Defendant has not been shown to be either so rich or so poor that the threat of monetary damages would be an insufficient incentive for her to stop repeating her illegal conduct. Under these circumstances, I am unpersuaded plaintiff has carried its heavy burden of demonstrating the courts may constitutionally enjoin defendant's future speech.

The Court of Appeal below found the injunction on defendant's future speech was an unconstitutional prior restraint, largely applying my concurring opinion in *Aguilar, supra,* 21 Cal.4th 121, 147. The majority today finds the injunction permissible in theory but overbroad as written, and therefore affirms the Court of Appeal's judgment reversing the injunction in part.[4]

---

[4] The portion of the injunction restraining defendant from videotaping plaintiff's business is not addressed by the majority. I therefore also express no opinion on it.

Because, like the Court of Appeal, I find the injunction to be an impermissible prior restraint, I concur in the majority's disposition. But because, for the reasons stated, I disagree with the majority's reasoning, I dissent.