Filed 9/9/24; Certified for Publication 10/3/24 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| E.G.,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>M.L.,<br><br>    Defendant and Appellant. | H051526<br>(Santa Cruz County<br>Super. Ct. No. 23CV01723) |

Representing herself, 17-year-old M.L.[1] challenges a civil harassment restraining order (restraining order) issued pursuant to Code of Civil Procedure section 527.6[2] protecting E.G.

E.G., a former romantic partner of M.L.'s mother, sought the restraining order after M.L. posted E.G.'s personal information on social media and alleged E.G. was supporting M.L.'s mother in abusive conduct against M.L. and M.L.'s younger brother, S.L. The restraining order prohibits M.L. from publishing E.G.'s personal or professional

---

[1] We refer to the parties by their initials to protect their privacy interests. (Cal. Rules of Court, rule 8.90(b)(4).) Although the self-represented parties have not requested anonymity in this appeal, protective nondisclosure is appropriate on the facts of this case. Moreover, maintaining the parties' anonymity is consistent with the confidentiality orders in the underlying civil case and closely related family law case, discussed *post*.

[2] Unspecified statutory references are to the Code of Civil Procedure.

contact information online and from defaming or harassing her.  On appeal, M.L. contends there was no clear and convincing evidence of harassment under section 527.6. She also maintains that the trial court failed to consider circumstances that made it unlikely the alleged harassment would continue or recur.

For the reasons explained below, we conclude that substantial evidence supports the imposition of the restraining order against M.L. but does not support the order extending beyond M.L. turning 18 years of age.  We will therefore modify the restraining order to expire on M.L.'s 18th birthday and affirm the order as modified.

## I.  FACTS AND PROCEDURAL BACKGROUND

The facts as presented in this appeal are contested.  Under the applicable rules of appellate review, we summarize the facts in the light most favorable to the judgment. (*Brekke v. Wills* (2005) 125 Cal.App.4th 1400, 1405 (*Brekke*); see *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 787 ["[W]e view the evidence, which was conflicting and vigorously contested, in a light most favorable to [the prevailing parties], resolving all conflicts in their favor"].)  We describe conflicting evidence only as relevant to M.L.'s contentions on appeal.  While certain facts and occurrences cited by the parties are intertwined with and related to issues that were—at the time—pending in contemporaneous family law litigation, we limit our discussion of the facts only to those directly relevant to this appeal.[3]

E.G. is the former girlfriend of M.L.'s mother.  Their relationship began in July 2018.  E.G., who is married in a non-monogamous relationship, lived part time with M.L.'s mother during their relationship and spent time with M.L. and S.L.  E.G. and her

---

[3] While the events relevant to this appeal were unfolding, M.L. and S.L. were the subjects of a widely publicized custody dispute in Santa Cruz County Superior Court. The family law case is relevant in limited respects to this appeal, and we refer to it as necessary to clarify the underlying circumstances and findings of the trial court in the civil restraining order matter.

2

wife occasionally babysat for M.L. and S.L., spent holidays with them, and went on outings.

During that time, M.L.'s parents were engaged in contentious family law proceedings regarding the children's custody. After an incident in December 2020 between M.L.'s father and E.G., E.G. sought a restraining order preventing M.L.'s father and stepmother from contacting her or going to her home. The parties in that restraining order case stipulated to a dismissal after M.L.'s father and stepmother entered into a personal conduct agreement in the family law litigation in which they agreed not to harass, threaten, or contact E.G. or her wife. According to M.L., E.G. convinced M.L.'s mother that M.L.'s father was dangerous and continued to become further enmeshed in her mother's legal battle against her father.

The custody dispute between M.L.'s and S.L.'s parents involved allegations of sexual and other abuse brought by the children against their mother. M.L. asserts that she and her brother "came forward" in 2022 with their "account of physical, psychological, and sexual abuse" by their mother, much of which "occurred while [E.G.] was the primary romantic and domestic partner" of M.L.'s and S.L.'s mother.

The family court found in October 2022 that the allegations by M.L. and her brother were " 'not credible,' " that M.L.'s mother did not sexually abuse the children, and that she was a "safe parent." The family court awarded custody to M.L.'s and S.L.'s mother. E.G. helped M.L.'s mother pack up and move with the children from Santa Cruz to Olympia, Washington.

Before their removal to Washington, M.L. states that her mother arranged for her and her brother to be "violently taken" to a reunification camp in Los Angeles where they were "seriously assaulted and injured, both physically and psychologically." M.L. maintains that the move to Washington was part of a plot to isolate her and her brother from their family, friends, community, and support. M.L. states that while in Washington she and her brother were forced to change their names and were sent back to the

3

reunification camp as punishment for speaking truthfully to their court appointed lawyer. M.L. asserts that E.G. and her mother were still "openly romantically involved" at that time. However, E.G. asserts that her relationship with M.L.'s mother ended upon the move to Washington, and she did not see M.L. again. She avoided contact for "a long time" in order to disentangle from M.L.'s family situation.

In late May 2023,[4] M.L. and S.L. ran away from their mother in Washington and returned to Santa Cruz, where they hid at their friend's house and paternal grandmother's house to avoid returning to their mother. In July, a neighbor told M.L. that a friend of E.G.'s was at the neighbor's house to spy on the children and report their whereabouts to E.G., who sought "to help [their] mother 'kidnap [them] back.' " M.L. believed that E.G. was stalking her and her brother and helping M.L.'s mother collect information about their location.

M.L. first posted information online about E.G. in early July. She posted the same video to TikTok and Instagram. In the video, which E.G. played for the trial court at the hearing, M.L. stated that E.G., her " 'mother's girlfriend,' " " 'protected [M.L.'s] mother and supported her sexual abuse of both [her] and [her] brother, as well as [their] mother's neglect, yet she is still an involved member of the community of therapists in Santa Cruz.' " M.L. stated that E.G. was a consultant with the same victim's advocate agency that interviewed M.L. and her brother about the sexual abuse claims, after which she asserted the police changed their investigation into M.L.'s mother's actions from felony sexual abuse to misdemeanor sexual abuse. M.L. also described an incident in which she alleged that her mother and E.G. took the children to San Luis Obispo without informing their father, left them alone in a hotel room "all night" and went to a separate room to have sex with E.G.'s other partners, and told M.L.'s younger brother to go to the Denny's

---

[4] M.L.'s declaration states that she ran away from Washington in May 2022; however, the evidence establishes that this event occurred in May 2023. Unless otherwise indicated, all dates were in 2023.

restaurant across the street by himself for breakfast since their mother would not be back until later that morning.  M.L. stated that E.G. " 'continued to support' " her mother and " 'helped her move [M.L. and her brother] to a different town to keep [them] hidden' " even after E.G. saw the video in which M.L.'s mother had the children " 'violently kidnapped.' "  M.L. accused E.G. of " 'using her resources in Santa Cruz to spy on' " M.L. and her brother and " 'report' " " " 'directly back to' " their mother, causing them to " 'still live in total fear of being taken back and put in a reunification camp or worse.' "  The video displayed several pictures of E.G. along with her office address, phone number, and e-mail.

E.G. asserts that at the time M.L. posted this video, she had not been in contact with M.L. for more than two years.  However, M.L. believed that E.G.'s alleged actions supporting M.L.'s mother put M.L. and her brother "in mortal danger of being harmed, kidnapped, abused, and threatened"—fears she asserts were "rational and reasonable" given her prior experience of being forcibly removed and made to live against her will with her mother.

In another video posted later in July to TikTok and Instagram, M.L. again referred to E.G. as M.L.'s mother's girlfriend.  In it, M.L. accused E.G. of "dating and supporting" M.L.'s mother, "a pedophile and child abuser."  M.L. noted that E.G. is a therapist in Santa Cruz, works with children, and "still supports" her mother even after seeing the video footage of M.L. and her brother "being taken."  M.L. reiterated her claim regarding E.G.'s alleged influence over the police investigation into M.L.'s mother's alleged abuse.  In the video, M.L. disclosed photographs of E.G. and E.G.'s professional contact information (including her work e-mail, office address, and phone number) and screen shots of her professional website, and named the professional organization in Santa Cruz with which E.G. is affiliated.  M.L. asked her social media followers to "please pressure" E.G. and "make her stop" because E.G.'s support of their mother puts M.L. and her brother "in danger."

5

M.L. asserts she took the TikTok and Instagram videos down after "less than a week" upon learning of the restraining order sought by E.G. M.L. acknowledged that other people may have reposted the videos before she took them down. M.L. "was not aware of anything violent or hateful" against E.G. until E.G. filed for the restraining order against her.

E.G. testified and submitted evidence showing that viewership of her professional website increased significantly after the second video was posted. E.G. received threats and harassment from unknown third parties, which she reported to law enforcement, and numerous false "Google reviews" to her professional online listing. Anonymous messages to her professional website's contact page expressed outrage that E.G. is "complicit with sexual assault of children" and "help[s] predators and apparently [has] sex with them." The messages told E.G. that she was being reported to the state licensing board, that they hoped her life "is destroyed like the lives of the children you have destroyed," and warned her " 'They're coming for you, [E.G.], better bat [*sic*] down the hatches. A storm is heading your way.' " E.G. also received explicit threats via voicemail. One message threatened to " 'see if we can't find somebody to tie you to a hotel bed, you fucking bitch, raping children.' " Another message called E.G. expletives, told her they were " 'digging up secrets' " and that she " 'better look left[,] . . . better look right' " and " 'be fucking paranoid' " because they were " 'watching [her].' "

On July 20, E.G. applied for a temporary restraining order against M.L., alleging online harassment and defamation by M.L. based on her widely viewed TikTok and Instagram videos, and attached documents in support of her request. E.G. noted that she had received threats from third parties. On July 21, the trial court issued a temporary restraining order. E.G. filed an additional declaration and documents in support of her request, and M.L. filed an amended response to the restraining order application together with supporting documents and declarations.

6

On July 28, the family court issued additional findings and order in the custody case to address the developments in that case. As a result, M.L. and S.L. were permitted to return to their father's residence.

During the restraining order hearing, M.L. and E.G. each testified and presented argument. E.G. argued that she needed the court to restrain M.L.'s harassment of her "online and otherwise." She noted it was undisputed that M.L. "made the posts" and had been harassing her online, and that E.G. was "receiving credible threats of bodily harm from random people online and reasonably fear[ed] for [her] safety."

M.L. responded that there was no basis for imposing a restraining order because the content had been removed, no further content about E.G. had been posted, and she had neither threatened E.G. nor asked anyone to threaten her. M.L. maintained that she acted with a legitimate purpose prompted by reasonable fear, since she was "on the run and hiding from [her] mother" at the time of the posts and believed that E.G. was continuing to support her mother in trying to " 'recapture' " her and send her back to "reunification camp." M.L. argued that her right to freedom of speech enabled her "to speak out" when under threat. M.L. urged the trial court to consider that this "is a serious legal action by an adult against a minor" that should not be addressed through a civil harassment restraining order but should be treated instead as a "domestic issue," given E.G.'s intimate relationship with M.L.'s mother and E.G.'s attacks on M.L.'s father.

On August 31, the trial court made a detailed ruling on the record granting E.G. pursuant to section 527.6 a three-year civil harassment restraining order against M.L.[5] The court noted that several issues discussed by the parties were the subject of prior litigation in which M.L. was represented by counsel and which decisions would likely

---

[5] M.L. requested a statement of decision of the trial court's ruling. Pursuant to section 632, the trial court made an oral record of the basis for its decision. (§ 632 [allowing a requested statement of decision to "be made orally on the record in the presence of the parties" when the court trial is concluded within one calendar day]; Cal. Rules of Court, rule 3.1590(n).)

have preclusive effect in this action.  The court took judicial notice of those findings and decisions in the family court action, including that the children's sexual abuse allegations against their mother were " 'not credible' " and that their mother was a "safe parent" with respect to the children's and father's allegations against her.

As to M.L.'s alleged civil harassment of E.G., the court found that by referring to E.G., as a therapist and a gay individual, as someone who is supporting the sexual abuse and terrorization of children by their mother, and by sharing E.G.'s contact information along with pleas to pressure her and make her stop, M.L. had engaged in "doxxing" and in a course of conduct causing E.G. to be threatened and harassed, which conduct was likely to continue absent a restraining order.[6]  The court concluded that E.G. had met her burden by clear and convincing evidence.

## II.  DISCUSSION

M.L. contends that E.G.'s evidence was insufficient to support issuance of the restraining order and asks this court to vacate it.  She argues that there is "no clear and convincing evidence of harassment" (capitalization omitted) and challenges the trial court's findings on the course of challenged conduct, the legitimate purpose behind the posts, E.G.'s emotional distress, and the probability the unlawful act will be repeated in the future.  E.G. counters that substantial evidence supports the trial court's order.

*A.  Section 527.6*

"Section 527.6 was enacted 'to protect the individual's right to pursue safety, happiness and privacy as guaranteed by the California Constitution.'  [Citations.]  It does

---

[6] The trial court defined doxxing as the dissemination of information to the purpose of causing others to harass somebody.  According to the Merriam-Webster Dictionary, to "dox" is "to publicly identify or publish private information about (someone) especially as a form of punishment or revenge."  (Merriam-Webster Dict. Online (2024) <https://www.merriam-webster.com/dictionary/dox> [as of Sept. 6, 2024], archived at: <https://perma.cc/D8XH-CT23>.)

so by providing expedited injunctive relief to victims of harassment." (*Brekke*, *supra*, 125 Cal.App.4th at p. 1412.)

Under section 527.6, subdivision (a)(1), "[a] person who has suffered harassment as defined in subdivision (b) may seek a temporary restraining order and an order after hearing prohibiting harassment as provided in" section 527.6. Section 527.6, subdivision (b)(3) defines " '[h]arassment' " in relevant part as "a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose. The course of conduct must be that which would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner."

Section 527.6, subdivision (b)(1) defines " '[c]ourse of conduct' " as "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, including following or stalking an individual, making harassing telephone calls to an individual, or sending harassing correspondence to an individual by any means, including, but not limited to, the use of public or private mails, interoffice mail, facsimile, or email. Constitutionally protected activity is not included within the meaning of 'course of conduct.' "

"If the [trial court] finds by clear and convincing evidence that unlawful harassment exists, an order shall issue prohibiting the harassment." (§ 527.6, subd. (i).) The " ' "[c]lear and convincing" ' " standard " 'requires a finding of high probability' " of unlawful harassment. (*Russell v. Douvan* (2003) 112 Cal.App.4th 399, 401 (*Russell*).)

*B. Analysis*

We review the trial court's decision to grant the restraining order for " 'whether the findings (express and implied) that support the trial court's entry of the restraining order are justified by substantial evidence in the record.' " (*Harris v. Stampolis* (2016) 248 Cal.App.4th 484, 497 (*Harris*).) When conducting our review, we must "not reweigh the evidence itself" (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1008 (*O.B.*)), but

9

must instead "view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id*. at pp. 1011–1012.) Whether the facts, supported by substantial evidence and construed most favorably in the petitioner's favor, are legally sufficient to constitute civil harassment under section 527.6 is a " 'question[] of law subject to de novo review.' " (*Harris*, at p. 497; *R.D. v. P.M.* (2011) 202 Cal.App.4th 181, 188 (*R.D.*).)

### 1. Course of Conduct

M.L. challenges the sufficiency of the evidence to support the restraining order as to four of the six components of unlawful harassment. (See *Parisi v. Mazzaferro* (2016) 5 Cal.App.5th 1219, 1227 (*Parisi*) [enumerating the elements of unlawful harassment, as defined by section 527.6, as (1) a knowing and willful course of conduct (2) directed at a specific person; (3) which seriously alarms, annoys, or harasses the person; (4) which serves no legitimate purpose; (5) which would cause a reasonable person to suffer substantial emotional distress and actually causes substantial emotional distress to the plaintiff; and (6) which is not a constitutionally protected activity], disapproved of in part on another ground by *O.B.*, *supra*, 9 Cal.5th at pp. 1003, fn. 4, 1005.)

Beginning with "course of conduct," M.L. contends that the trial court identified only one of the videos as harassment. M.L. asserts that although she had simultaneously posted the video to two social media platforms, the posting constituted "a single act at a single point in time" and was, in any event, removed soon after by M.L. M.L. argues that such a single incident of harassment does not satisfy the statutory requirement for a course of conduct warranting injunctive relief.

The statute defines " '[c]ourse of conduct' " as "a series of acts over a period of time, however short, evidencing a continuity of purpose." (§ 527.6, subd. (b)(1).) Webster defines "series" as "a number of things or events of the same class coming one

10

after another in spatial or temporal succession." (Webster's 10th New Collegiate Dict. (1999) p. 1069.)

Beyond the requirement that there be more than one act to qualify as a " '[c]ourse of conduct' " (§ 527.6, subd. (b)(1)), the statute does not prescribe the necessary number or frequency of the acts required for a finding of course of conduct harassment. Moreover, in deciding whether to issue the order, the trial court views the evidence as a whole, including incidents that, if viewed in isolation, might seem trivial, but cumulatively could constitute a harassing course of conduct. (*R.D.*, *supra*, 202 Cal.App.4th at p. 190.)

We decide the record contains substantial evidence from which the trial court could conclude that M.L. made a series of social media posts constituting a "course of conduct" under the statute. These posts include at least two different video messages posted to Instagram and TikTok on separate dates in July 2023.[7]

We disagree with M.L. that the trial court found "[o]nly one post" met the definition of harassment. In determining that there was a course of conduct, the court cited "the posting that was made on Instagram and the documentation reflecting the language that it contained." Although the court referred to the posting on Instagram in the singular, it did not specify which Instagram posting and moreover described the posting in a manner inclusive of both videos discussed and reviewed at the hearing, each of which had been posted to Instagram and TikTok. This is consistent with the court's observation that "the issue before the [c]ourt . . . is whether or not the *postings* by [M.L.] pertaining to the petitioner here, [E.G.], constitutes a knowing and willful course of

---

[7] Although it is not entirely clear from the record which video the trial court and parties are referencing, E.G.'s declarations and testimony establish that there were two separate videos posted by M.L. about E.G. M.L. posted one video in early July and the second video later in July, on or about July 18. She posted an additional video on August 15, describing the pending restraining order request and referring to E.G. as her mother's " 'girlfriend.' "

conduct." (Italics added.) The evidence at trial showed that both of these postings shared E.G.'s direct contact information and pictures and accused her as the children's mother's " 'girlfriend' " of supporting an alleged child abuser. The evidence at trial and submitted in support of the restraining order also established that M.L. "positively commented" on comments of support in response to the social media posts about E.G.

The statute does not require express findings by the trial court of the elements of harassment as defined in section 527.6, subdivision (b). (*Ensworth v. Mullvain* (1990) 224 Cal.App.3d 1105, 1112 (*Ensworth*), disapproved in part on another ground in *O.B.*, *supra*, 9 Cal.5th at p. 1010, fn. 7.) Thus, the trial court's reference to "posting" in the singular is not determinative. Furthermore, we are not limited by the trial court's reasoning and are instead concerned with the correctness of the trial court's order. (See, e.g., *In re Marriage of Mathews* (2005) 133 Cal.App.4th 624, 632.) M.L.'s effort to narrow our review of the evidence supporting the trial court's ruling to just one of the videos she posted is inconsistent with the evidence adduced at trial and with the standard of review for findings of fact.[8]

"[W]hen presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the [reviewing] court must determine whether the record, *viewed as a whole*, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*O.B.*, *supra*, 9 Cal.5th at p. 1005, italics added.) We conclude that the trial court's finding of a course of conduct within the meaning of

_____

[8] M.L. requested a statement of decision and obtained a detailed oral ruling on the record (see § 632) setting forth the trial court's "ultimate findings" (*Almanor Lakeside Villas Owners Assn. v. Carson* (2016) 246 Cal.App.4th 761, 770) on key elements of the alleged harassment, including course of conduct. Because M.L. did not bring any perceived deficiencies in the ruling on course of conduct to the trial court's attention when it rendered its decision, we continue to apply the appellate presumption drawing all inferences in support of the court's ultimate finding on course of conduct. (*Id*. at p. 771; see also *Gomez v. Smith* (2020) 54 Cal.App.5th 1016, 1026–1027.)

the statute was properly informed by all the online content posted by M.L. in which she shared E.G.'s photos and information and portrayed her as someone who supports pedophilia, kidnapping, and child abuse, has influenced the investigations into M.L.'s and S.L.'s sexual abuse allegations, and has spied on the children to report their movements back to their mother. (*Harris*, *supra*, 248 Cal.App.4th at p. 497.) These facts, construed most favorably for E.G., are substantial evidence that M.L.'s social media posts about E.G. constituted a "pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose." (§ 527.6, subd. (b)(1); see *Harris*, at p. 497; *O.B.*, at pp. 1011–1012.)

### 2. Protected Speech for a Legitimate Purpose

M.L. contends there was insufficient evidence to support a finding of harassment based on a course of conduct "directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose." (§ 527.6, subd. (b)(3).) M.L. asserts that her conduct had a legitimate purpose and was protected free speech activity because she "felt she was being hunted" by her mother and E.G., "feared for her life and the life of her brother," and "did the only thing she thought she could do to protect herself" by broadcasting "calls for help" on Instagram and TikTok. M.L. maintains that her "calls for help" on social media were protected by her First Amendment right to freedom of speech.

Under the circumstances of this case, whether M.L.'s posts were constitutionally protected free speech is closely tied to whether the posts were for a legitimate purpose. As a general principle, "speech that constitutes 'harassment' within the meaning of section 527.6 is not constitutionally protected, and the victim of the harassment may obtain injunctive relief." (*Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228, 1250.) More specifically, harassing speech that is not constitutionally protected and is made with "no legitimate purpose" may qualify the protected party for an injunction. (§ 527.6, subd. (b)(1), (2); cf. *Hansen*

13

*v. Volkov* (2023) 96 Cal.App.5th 94, 105 (*Hansen*) [reversing restraining order where e-mails sent by attorney were constitutionally protected and thus "it was error for the court to conclude they were properly considered part of a course of conduct of harassment"].) "Whether a restraining order passes constitutional muster is also a question of law we consider de novo." (*Parisi*, *supra*, 5 Cal.App.5th at p. 1227.)

In her declaration opposing the restraining order, M.L. stated that after fleeing Washington and taking refuge at her grandmother's house in Santa Cruz, a friend informed her that a neighbor had one of E.G.'s friends visiting and that E.G.'s friend was there to spy on the children and report back to E.G. M.L. asserted in her declaration that it was "clear that [E.G.] has continued to stalk [her] and [her] 12-year-old brother and share this information with" their mother, whom E.G. "was helping" to collect information about the children's location. M.L. argued at trial that she acted on a "reasonable belief, based on [E.G.'s] previous persistent involvement" and on "what other credible sources" had told her, that E.G. was helping her mother locate her and thus her posts were "prompted by reasonable fears, intense fears based on [*sic*] being severely harmed." However, E.G. testified that she had not been in touch with M.L. for almost two years when M.L. posted the first video and had not been in contact with M.L.'s mother until M.L.'s harassment of E.G. began.

We infer from the trial court's findings that the court did not credit M.L.'s statements that E.G. was "stalk[ing]" her and S.L. and that "credible sources" had informed her that E.G. was working with M.L.'s mom to "spy" on the children and " 'recapture' " them. The court's observation that M.L.'s conduct was "doxxing, as far as this [c]ourt is concerned" further implies that the court found M.L.'s publication of E.G.'s photos and contact information in connection with the allegations about E.G. to

14

constitute harassment not for a legitimate purpose.[9] It is the province of the fact finder "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." (*O.B.*, *supra*, 9 Cal.5th at pp. 1007–1008.) On appeal, we do not "reweigh the evidence" but "accept the fact finder's resolution of conflicting evidence." (*Id.* at p. 1008.)

The trial court's implied finding that M.L.'s posts were not for a legitimate purpose is supported by substantial evidence in the record. M.L. presented no evidence, only conjecture, that E.G. was involved in the family's affairs at the time M.L. and S.L. returned to Santa Cruz, let alone sent someone to spy on the children and help their mother try to " 'recapture' " them. On the other hand, E.G. testified that she "never spied" on M.L., had "actively avoided any contact" with M.L.'s father (against whom she had obtained a stipulated protective order), and "hadn't been in contact" with M.L.'s mother until "not very long ago" when M.L.'s harassment of her began. The trial court resolved this conflicting evidence in E.G.'s favor, finding E.G. "has met [her] burden of proof by clear and convincing evidence to establish the existence of unlawful harassment within the meaning of [s]ection 527.6 of the Code of Civil Procedure."

M.L.'s assertions are further weakened by the findings and orders from the family law case, of which the trial court appropriately took judicial notice. (See Evid. Code,

---

[9] E.G. argues that doxxing is a misdemeanor under this state's Penal Code. (Pen. Code, § 653.2.) Under this section, the law criminalizes electronic distribution of a harassing message with the intent to place that person in reasonable fear for their safety, where the electronically published material contains "personal identifying information, including, but not limited to, a digital image of another person, or an electronic message of a harassing nature about another person" (*id.*, subd. (a)) and where " '[o]f a harassing nature' means of a nature that a reasonable person would consider as seriously alarming, seriously annoying, seriously tormenting, or seriously terrorizing of the person and that serves no legitimate purpose." (*Id.*, subd. (c)(2).) However, the trial court's indication that it considered M.L.'s conduct to be "doxxing," appears to use that term in a colloquial sense rather than as a specific finding under the definition set out in the Penal Code.

§ 452, subd. (d)(1).)[10]  These findings, which have not been further adjudicated or disturbed on appeal, discredit M.L.'s claim that her social media posts were "prompted by reasonable fears, intense fears based on [*sic*] being severely harmed."  These findings also undermine M.L.'s claim that her posts were constitutionally protected.  While speech " 'on " 'matters of public concern' " [] is "at the heart of the First Amendment's protection" ' " (*Brekke*, *supra*, 125 Cal.App.4th at p. 1409, quoting *Dun & Bradstreet v. Greenmoss Builders* (1985) 472 U.S. 749, 758–759), defamatory speech is not constitutionally protected.  (*Brekke*, at p. 1409; see *Parisi*, *supra*, 5 Cal.App.5th at p. 1229 [agreeing with the trial court's implicit conclusion that the restrained party's "attacks . . . were false, defamatory, and served no legitimate purpose" and therefore were not excluded as protected speech from § 527.6]; *Balboa Island Village Inn, Inc. v. Lemen* (2007) 40 Cal.4th 1141, 1147 (*Lemen*) [noting defamation among the " 'categories of communication' " to which First Amendment protection does not extend].)

Absent evidence to the contrary, the family court's prior determination that M.L.'s accusations against her mother were false and not credible logically extends to M.L.'s repetition of those accusations in connection with her claims about E.G.  In finding unlawful harassment and evidence of "doxxing," the trial court implicitly concluded that M.L. was not credible and was continuing to disseminate a false narrative about her mother's abuse and E.G.'s purported support and assistance.

"While First Amendment protection is required for free and uninhibited discussion of public issues, important social values underlie the law of defamation, and ' "[s]ociety has a pervasive and strong interest in preventing and redressing attacks upon

---

[10] We take judicial notice of the same orders cited by the trial court.  (Evid. Code, § 459, subd. (a).)  These are the December 20, 2022 statement of decision in the family law case, the December 20, 2022 findings and order after hearing, and the July 28, 2023 findings and order re: minor children's return to petitioner-father's residence and related conduct orders.  On our own motion, we order the record augmented with a copy of those orders.  (Cal. Rules of Court, rule 8.155(a)(1)(A).)

16

reputation." ' " (*Parisi*, *supra*, 5 Cal.App.5th at p. 1229; *Lemen*, *supra*, 40 Cal.4th at p. 1157 ["[T]he general rule that a defamation may not be enjoined does not apply in a circumstance . . . in which an injunction is issued to prevent a defendant from repeating statements that have been judicially determined to be defamatory"].) We conclude that substantial evidence in the record supports the trial court's findings (express and implied) of harassment for no legitimate purpose. We further conclude that M.L.'s social media posts repeating accusations already adjudicated to be false, and further attempting to link E.G. to those accusations in a defamatory manner, does not come within the meaning of "[c]onstitutionally protected activity" under section 527.6, subdivision (b)(1). The trial court therefore did not err in deeming the social media posts "harassment" within the meaning of the statute.[11]

### 3. Emotional Distress

M.L. also contends that there was "no evidence" that E.G. suffered substantial emotional distress due to M.L.'s conduct. As explained further below, we decide the record amply supports the trial court's finding—implied by its issuance of the order and express recognition that a finding of substantial emotional distress was required—that M.L.'s course of conduct "would cause a reasonable person to suffer substantial emotional distress" and did "actually cause [E.G.] substantial emotional distress." (§ 527.6, subd. (b)(3).)

A trial court may infer substantial emotional distress from the nature of the harassing conduct. (*Ensworth*, *supra*, 224 Cal.App.3d at pp. 1110–1111.) Moreover, "[i]nferences may be drawn not only from the evidence but from the demeanor of witnesses and their manner of testifying." (*Id*. at p. 1110.) When assessing witness testimony, " ' " 'it is the exclusive province of' " ' " the trial court " ' " 'to determine the

---

[11] Because M.L. has not challenged the scope of the restraining order, we need not address E.G.'s arguments that the restraining order is sufficiently narrowly tailored consistent with constitutional requirements.

credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " ' " (*Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 968.) We "may not insert [our] own views regarding the credibility of witnesses in place of the assessments conveyed by the judgment." (*O.B.*, *supra*, 9 Cal.5th at p. 1008.)

M.L. concedes that E.G. "received disturbing messages" but maintains that these "do not by themselves demonstrate any emotional distress suffered by" E.G. The record belies this interpretation of the evidence. The trial court presided over the hearing at which the parties testified and assessed their demeanor and credibility, as well as the evidence of the effect of M.L.'s behavior on E.G. and the third party responses it generated. E.G. testified about the impact of M.L.'s posts to her professional reputation and on her relationship with clients and former clients, many of whom had viewed the videos "of [M.L.] slandering [her], talking about fictitious information about [her] sex life, [and] that [she's] a child abuser."

The evidence submitted by E.G. in support of the restraining order showed M.L.'s posts accusing E.G., as a therapist who works with teens, of "currently dating and supporting [M.L.'s] mother, a pedophile and child abuser." E.G. also described at trial the false reviews posted by third parties to her business listing and the disturbing and threatening messages she had received as a result of M.L.'s posts. E.G. received voicemail messages calling her " 'a fucking whore ass bitch,' " stating they had seen M.L.'s Instagram " 'about [E.G.] and [her] girlfriend raping [M.L.] and putting her in a hotel at 14, raping a 14-year old,' " threatening to " 'see if we can't find somebody to tie [E.G.] to a hotel bed, [] fucking bitch, raping children,' " and warning her she " 'better be fucking paranoid' " as they were " 'watching her.' "

Drawing all reasonable inferences in favor of the trial court's order, M.L.'s disturbing accusations against E.G., together with the derogatory and threatening messages directed at E.G. by those who viewed M.L.'s posts, "would cause a reasonable person to suffer substantial emotional distress." (§ 527.6, subd. (b)(3).) Furthermore, as

18

implied by E.G.'s testimony and the trial court's express finding that E.G. had met her burden of proof by clear and convincing evidence, we conclude that substantial evidence in the record supports the implied finding that M.L. did "actually cause [E.G.] substantial emotional distress." (*Ibid*.)

### 4. Conduct Must Be Likely to Recur

M.L. contends there was insufficient evidence that the course of challenged conduct was ongoing or likely to recur. She maintains that she had removed the offending post (or posts, as we have determined *ante*) in mid-July 2023, more than a month before the hearing on the restraining order, and that there was "[n]o further conduct [] alleged beyond the initial post." She argues that her "voluntary removal of the post in question" supported the denial of injunctive relief and, furthermore, that the trial court failed to consider M.L.'s circumstances at the time of the hearing such that there was no reason to believe she would again post online about E.G. M.L. argues that the court's failure to account for these changes is further evidenced by its issuance of injunctive measures that go beyond M.L. turning 18 years old. M.L. states, "The conditions that led to [M.L.]'s act of alleged harassment would logically not be possible to exist after she turned 18 and was no longer in the jurisdiction of the Family Court or her mother's custody."

M.L. correctly points out that a past act of harassment is insufficient to justify a restraining order. (*Harris*, *supra*, 248 Cal.App.4th at p. 499.) "[A]n injunction serves to prevent future injury and is not applicable to wrongs that have been completed. An injunction is authorized only when it appears that wrongful acts are likely to recur." (*Russell*, *supra*, 112 Cal.App.4th at p. 402.) Thus, the statute requires "clear and convincing evidence that unlawful harassment *exists*" (§ 527.6, subd. (i), italics added), "not that it existed in the past." (*Russell*, at p. 403, citing § 527.6, former subd. (d).) "The injunctive relief is not intended to punish the restrained party for past acts of harassment." (*Yost v. Forestiere* (2020) 51 Cal.App.5th 509, 520.)

19

" '[T]he determination of whether it is reasonably probable an unlawful act will be repeated in the future rests upon the nature of the unlawful violent act evaluated in the light of the relevant surrounding circumstances of its commission and whether precipitating circumstances continue to exist so as to establish the likelihood of future harm.' " (*Harris*, *supra*, 248 Cal.App.4th at pp. 499–500, quoting *Scripps Health v. Marin* (1999) 72 Cal.App.4th 324, 335, fn. 9.) In *Scripps*, the son of a hospital patient struck a hospital employee with a door as he attempted to leave a tense meeting with hospital staff. (*Id*. at p. 328.) The hospital obtained an order under section 527.8 enjoining the patient's son from any direct contact with hospital employees. (*Id.* at p. 330.) The appellate court reversed the order after concluding there was no evidence the son was likely to commit further acts of violence against the hospital's employees. (*Id*. at p. 336.) Among other factors, the court noted there was no prior or subsequent threat of violence by the son against a hospital employee, the temporary restraining order was vacated when the son stated that he would stay away from the hospital pending the evidentiary hearing and he abided by this representation, and the mother had since transferred health insurance making it unlikely she would return as a patient at the hospital. (*Ibid*.) The court concluded that "given the circumstances surrounding this single incident, the evidentiary record does not establish the likelihood [the son] would repeat any violent acts against [hospital] employees." (*Ibid*.)

Similarly in *Russell*, the appellate court reversed a restraining order based on a "single incident of battery without finding a threat of future harm" (*Russell*, *supra*, 112 Cal.App.4th at p. 401) where the restrained party was an attorney who had followed opposing counsel into an elevator after an appearance and grabbed his arm. (*Id*. at p. 400.) In *Hansen*, the appellate court reversed a restraining order after concluding that the restrained party's harassing letters to opposing counsel were protected speech, and the only nonprotected conduct consisted of a single "30-minute episode" (*Hansen*, *supra*, 96 Cal.App.5th at p. 107) in which the restrained party refused to leave opposing counsel's

office despite knowing that the scheduled deposition had been cancelled. (*Ibid*.) The appellate court reasoned that the single incident alone was insufficient to justify a restraining order. (*Ibid*.)

The trial court expressly found M.L.'s course of conduct "likely to continue unless a restraining order prohibits it going forward." Although the trial court did not identify the basis for this determination, the evidence at trial necessarily required it to evaluate conflicting evidence about when the posts were taken down, whether the posted material was still available online as of a few days before the hearing, and to consider M.L.'s arguments about what she characterized as E.G.'s continued "emotional[] attach[ment]" to M.L. and continued support of M.L.'s mother. M.L. asserted at trial that once she was "safe" (presumably referring to being back in her father's home), "the online content was removed." However, M.L. also testified that she had taken down the TikTok and Instagram content because of "[t]his restraining order and the belief that it was not helpful." According to E.G.'s testimony, at least one of the videos (which was played for the trial court at the hearing) was still circulating on TikTok only a few days before the hearing.

Giving "appropriate deference" (*O.B.*, *supra*, 9 Cal.5th at p. 1011) to the trial court's evaluation of credibility and its resolution of conflicts in the evidence, we conclude substantial evidence in the record supports the court's determination that a recurrence of harassment was likely unless it issued an injunction prohibiting future posts defaming or harassing E.G. Viewed in the light most favorable to the order, M.L. posted one video to two platforms, followed by another video to two platforms, engaged with her followers in comments to the posts, removed the post (or posts) only because of the pending restraining order, and repeated her claims against her mother and E.G. at trial despite the family court's prior adjudication rejecting the truthfulness of the underlying accusations. This conduct supports the court's finding that M.L.'s course of conduct was likely to recur absent a restraining order. It also stands in contrast with the type of single

21

or isolated incident courts have found do not justify injunctive relief as described in *Scripps*, *Russell*, and *Hansen*.

Nevertheless, we are mindful of M.L.'s youth at the time these events transpired and that the three-year order will extend beyond her 18th birthday. M.L. argues that the conditions that led to her conduct against E.G. cannot logically exist after she turns 18 years old, since at that point she will not be under the jurisdiction of the family court or her mother's custody. She contends that in issuing a three-year restraining order, the trial court failed to consider the "complete set of circumstances that would have caused the act[s] and would need to be present to likely cause [those acts] again." E.G. counters that because M.L.'s harassment of her is "tied not to [M.L.]'s current custody situation, but to [M.L.]'s ongoing conflict with her mother," the trial court correctly ascertained that M.L. "reasonably might at some point in the future decide to doxx [E.G.] online again."

Considering the relevant circumstances surrounding M.L.'s harassment of E.G. " 'and whether precipitating circumstances [will] continue to exist so as to establish the likelihood of future harm' " (*Harris*, *supra*, 248 Cal.App.4th at pp. 499–500) beyond M.L.'s 18th year, we conclude there is insufficient evidence in the record to support continuing the restraining order beyond M.L.'s 18th year. In drawing this conclusion, we recall that "an appellate court must account for the clear and convincing standard of proof when addressing a claim that the evidence does not support a finding made under this standard." (*O.B.*, *supra*, 9 Cal.5th at p. 1011.) Consistent with this standard, the evidence—when viewed in the light most favorable to the prevailing party in the trial court and giving appropriate deference to the fact finder's evaluation of credibility (*ibid.*)—must be sufficient such that the trial court " 'could have found it highly probable' " that M.L. would repeat her unlawful harassment of E.G. even after M.L. reached the age of majority. (*Technology Credit Union v. Rafat* (2022) 82 Cal.App.5th 314, 323 [applying the clear and convincing standard articulated in *O.B.* to a workplace

22

violence restraining order under § 527.8]; see Fam. Code, §§ 6500–6502 [defining, respectively, the terms "minor," "adult," and " 'age of majority' "].)

As M.L. points out, the circumstances that precipitated her social media posts were closely tied to the family court case and M.L.'s asserted fear of being returned to her mother's custody and thereby subjected to further reunification therapy and alleged abuse. M.L.'s online dissemination of false and damaging accusations against E.G. began only when M.L. was "in hiding and in fear" of being returned to her mother. While there is ample evidence that M.L. began posting about E.G. because she believed E.G. was still supporting her mother and engaged in conduct to help her mother locate and retrieve the children, our review of the record discloses insufficient evidence to support E.G.'s assertion that M.L.'s harassment of her is related not only to her alleged support of M.L.'s mother in the custody dispute but to M.L.'s general "ongoing conflict with her mother."

When M.L. turns 18 years of age, she becomes an adult. (Fam. Code, § 6501.) She "will then have the right and responsibility to make her own decisions" regarding her residence and the role of her parents in her life. (*Brekke*, *supra*, 125 Cal.App.4th at p. 1415, [modifying restraining order to expire when the 16-year-old protected party turns 18, at which time she would not be subject to her parents' "direction and control" as to whether she associates with the restrained party or elects to renew the injunction].) Insofar as the evidence shows M.L.'s harassment of E.G. was closely tied to her belief about E.G.'s alleged continuing support of M.L.'s mother in her custody battle with M.L.'s father, we decide it is " 'reasonably probable an unlawful act will be repeated in the future' " (*Harris*, *supra*, 248 Cal.App.4th at p. 499) only so long as M.L. remains a minor subject to the custody dispute between her parents. We will therefore modify the injunction to expire on M.L.'s 18th birthday.

23

### III. DISPOSITION

The September 5, 2023 civil harassment restraining order is modified to expire on January 27, 2025, and is affirmed as modified. The trial court is directed to transmit a copy of the modified order for entry into the California Restraining and Protective Order System (CARPOS) through the California Law Enforcement Telecommunications System (CLETS). (Fam. Code, § 6380.) In the interest of justice, the parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

_____

Danner, J.

WE CONCUR:

_____

Bamattre-Manoukian, Acting P. J.

_____

Bromberg, J.

**H051526**
*E.G. v. M.L.*

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| E.G., <br><br>     Plaintiff and Respondent, <br><br>     v. <br><br> M.L., <br><br>     Defendant and Appellant. | H051526 <br> (Santa Cruz County <br>  Super. Ct. No. 23CV01723) |

BY THE COURT:

The opinion in this case filed September 9, 2024, was not certified for publication. After the court's review of a request under California Rules of Court, rule 8.1120(a), and it appearing that the opinion meets the standards for publication under California Rules of Court, rule 8.1105(c)(2) and (6), it is therefore ordered that the opinion be published in the Official Reports.

1

_____

Danner, J.


_____

Bamattre-Manoukian, Acting P. J.


_____

Bromberg, J.

Trial Court:                Santa Cruz County Superior Court

Trial Judge:                The Honorable Jordan Sheinbaum

M.L., in pro. per., for Defendant and Appellant.

E.G., in pro. per., for Plaintiff and Respondent.

H051526
**E.G. v. M.L.**